VOLUNTEER STATE LIFE INS. CO *v.* JOHN RICHARDSON.

(*Jackson.* April Term, 1922.)

1. **TRIAL.** Finding of fact by court as to provisions of policy must be given reasonable meaning.

While ambiguous language in an insurance policy is to be interpreted most strongly against the insurer, the rule does not obtain in the interpretation of findings of fact of the court with respect to the provisions of the policy, but such finding must be given a reasonable and natural meaning. (*Post, pp.* 595, 596.)

Code cited and construed:  Sec. 3306 (S.).

2. **INSURANCE.** Whether misrepresentations by insured increased risk of loss a question of law for court.

Under Shannon's Code, section 3306, as to effect of misrepresentations as to matters increasing the risk of loss, after it had been determined that representations by an insured person as to his use of intoxicating liquor were false, whether the misrepresentations increased the risk was a question of law for the court. (*Post, pp.* 596-604.)

Cases cited and approved: Hunter v. Guaranty Co., 129 Tenn., 572; First Nat. Bank v. Fidelity & G. Co., 110 Tenn., 10; Hale v. Sovereign Camp W. O. W., 143 Tenn., 555; Rand v. Life Assurance Society, 97 Tenn., 291.

Cases cited and distinguished: Mutual Life Ins. Co. v. Dibrell, 137 Tenn., 528; Schas v. Equitable Life Ins. Co., 166 N. C., 55; K. of P. v. Cogbill, 99 Tenn., 28; Blackman v. Casualty Co., 117 Tenn., 585

3. **INSURANCE.** Statement of opinion of applicant as to trival matter will not avoid policy.

Under Shannon's Code, section 3306, as to effect of misrepresentations, a mere statement of a trival matter in answer to a question in negotiating insurance, in no way relating to the cause of death,

the answer depending upon the opinion of the applicant, will not make the answer-false. (*Post, pp.* 604-606.)

4. **INSURANCE.** To avoid policy, misrepresentations must reasonably affect insurer's judgment.

Under Shannon's Code, section 3306, to avoid a policy because of misrepresentations the matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment. (*Post, pp.* 606, 607.)

5. **INSURANCE.** Cancellation of policy held proper for misrepresentations as to using liquor.

Under Shannon's Code, section 3306, misrepresentations by the insured that he did not use intoxicating liquors constituted ground for cancellation of the policy, where it was established insured was an habitual user of intoxicating liquors. (*Post, p.* 607.)

---

FROM HENRY.

---

Appeal from Chancery Court of Henry County.—HON. W. H. DENNISON, Judge.

FITZHUGH & ATKINS, for appellant.

MILLER & MILLER and BRYANT & BRYANT, for appellee.

MR. L. D. SMITH, Special Judge, delivered the opinion of the Court.

The original bill in this case was filed by the insurance company for the purpose of avoiding and canceling a life insurance policy issued by it on or about July 22, 1920, to the defendant's intestate, Gregson, payable to his personal representative, for $5000, upon the ground that in the application for the policy the deceased made false and fraudulent representations material to the risk.

The defendant answered the bill denying the material averments thereof with respect to every misrepresentation and concealment and also filed a cross-bill seeking to recover the full amount of the policy with interest and penalty. A jury was demanded, but the case was heard before the chancellor, parties agreeing that his finding should have the same force and effect as the findings both of the court and a jury. The chancellor's findings of fact were reduced to writing and made a part of the decree in the case, with the result that the original bill was sustained and the cross-bill dismissed.

The cross-complainant has appealed and assigned the action of the chancellor as error.

It is conceded that on the 22d of July, 1920, the complainant issued a $5000 policy to M. Q. Gregson, payable to his administrator, and that he died November 19, 1920, before the bill in this case was filed. Proper proofs of death were furnished to the insurance company and payment thereof demanded. The insurance company refused to pay the policy and tendered a return of the premium to the administrator and made written request for the surrender of the policy, setting forth that certain misrepresentations had been made in the application for the policy. The administrator refused to surrender the policy, but demanded its payment. The original bill was filed within the contestable period of one year as provided in the policy.

The contest is based upon certain questions and answers appearing in the application for the policy, to wit:

"What, if any, is your daily habit in the use of tobacco and alcoholic stimulants—Tobacco? No. Stimulants? No.

"During the past two years what has been your monthly average in the use of—Wines? No. Malt liquors? No.

"During the past five years how often have you used any of these to excess, and, if so, date of last excess or intoxication? Date? None."

It is conceded by counsel for the complainant—and that result would follow whether conceded or not—if the answers given to the questions as above indicated were true, then the complainant must fail in this action and it would be liable for the face of the policy. But it is asserted that there is evidence in the record to show that these answers were false and that the parties are concluded by the finding of the chancellor that the answers were false, and at all events the preponderance of the evidence is that way. On the other hand, the administrator contends that the chancellor did not find as a fact that the answers were false, but that he only found that the deceased for many years prior to signing the application was accustomed to and in the habit of taking intoxicating liquors, and had on some occasions been to some extent under the influence thereof, and that the existence of such facts were not sufficient to entitle the insurance company to avoid the payment of the policy. As stated in the brief filed on behalf of the administrator, the insistence is—"That in order for the insurance company to avoid the policy involved herein, on the ground that the deceased misrepresented the facts touching his use of intoxicating liquors prior to the date on which he signed the application for said policy, that it be affirmatively and positively shown that the deceased continuously and excessively indulged in the use of intoxicating liquor to the extent that his use thereof had become habitual. It was not enough for the insurance

company to show that the deceased, on exceptional occasions, drank intoxicating liquor, as most men do, but it was absolutely necessary under the law, according to our insistence, for the insurance company to go further and prove that the deceased habitually engaged in the use of intoxicating liquor to the extent that his health or physical condition had become affected, and that he had been rendered an unsafe risk for life insurance."

The soundness of this contention is controverted by the insurance company, who, conceding that the misrepresentations were not made with actual intent to deceive, as was found by the chancellor, asserts that every fact which is untruly stated must be regarded as material, and therefore, being untrue, entitles the insurance company to avoid the policy.

The question at issue is admittedly governed by our Insurance Act of 1895, found in Shannon's Code at section 3306, which provides: "No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation (or warranty) is made with actual intent to deceive, or unless the matter represented increase the risk of loss."

There being no contention here by the insurance company that the answers to these questions were made with actual intent to deceive, it remains to inquire, first, whether the answers were true or false, and, secondly, if false, whether the matter represented therein "increases the risk of loss."

146 Tenn.—38

The inquiry as to whether the answers were true or false is answered by the finding of fact made by the chancellor. The exact language of the chancellor on this point is as follows:

"That the deceased, Gregson, was at the date of his signing the application, at the date he accepted the policy, and for many years prior thereto, accustomed to and in the habit of taking intoxicating liquors, and had on some occasions been to some extent under the influence thereof, according to the testimony of Derrington, Hicks, J. H. Riley, and other witnesses for the company, including Roy Riley; and the testimony of the widow of the deceased, in which she is commended, who frankly says that he was like other men, in that he took a drink sometimes, but she had never seen him when he could not go until on or after the 7th day of August, 1920, after which time she says that it seemed to get on his nerves more than before; and that his answers to the questions in his application touching his habit in the use of liquors was not true; but that such answers, under all of the proof of the cause, were not made for the purpose of defrauding the insurer, since he was not anxious to obtain the insurance, but the court acting as court and jury is forced to the belief that such answers were made more to conceal the facts of his use of intoxicating liquor as a matter of general information among his business association; which is accordingly ordered, adjudged, and decreed."

It is argued with much plausibility by learned counsel that the fact that the deceased was accustomed to and in the habit of taking intoxicating liquors, and had on some occasions been to some extent under the influence thereof, is not a finding that the answers given by the deceased

Volunteer State Life Ins. Co. v. Richardson.

to the particular questions asked were false. The first question asked in the application is, "What, if any, is your daily habit in the use of alcoholic stimulants?" The answer is, "No." Undoubtedly this means that the applicant intended to reply that he did not have any daily habit in the use of alcoholic stimulants. The chancellor did not specifically find that he did have a daily habit in the use of alcoholic stimulants. Likewise it is argued the answer of, "No," to the question, "What has been your monthly average in the use of alcoholic liquors during the past two years," meaning he did not have any monthly average in the use of intoxicating liquors, is not controverted by the mere fact that he was accustomed to and in the habit of taking intoxicating liquors. And so the argument runs with reference to the other question as to how often the applicant had used intoxicating liquors to excess during the past five years, to which he replied, "None." In other words, the argument is that although the applicant was accustomed to and in the habit of taking intoxicating liquors and had on some occasions been to some extent under the influence thereof, it does not follow therefrom that the applicant had a daily habit and a monthly average in the use thereof, or that he had used alcoholic liquors to excess or intoxication.

The argument adopts a very limited and technical interpretation of the findings of the chancellor. When it is said that one is accustomed to and in the habit of using alcoholic stimulants, it may well be insisted that this is a daily habit. Certainly it cannot be said that he does not have any monthly average, and when it is said that one on occasions had been to some extent under the influence of intoxicating liquors it naturally negatives the idea that

he had not for five years used it to excess. While ambiguous language in an insurance policy is to be interpreted most strongly against the insurer, that rule does not obtain in the interpretation of the findings of fact of the court with respect to the provisions of the policy, but such finding must be given a reasonable and natural meaning. Evidently this finding was intended by the chancellor to controvert the truthfulness of the answers given in the application. But we are not left to interpret the chancellor's language, and all doubt of his meaning is removed when he says, "and that his answers to the questions in his application touching his habit in the use of liquors were not true." We have, therefore, an explicit finding of fact by the chancellor, which the parties have agreed shall be given the weight usually given to the verdict of a jury, to the effect that the statements made by the deceased in his application for the insurance policy were untrue, and this is so whether we treat his finding as a general verdict or as an answer to specific issues. This being true, if his statements are to be considered as being warranties, the right of the insurance company to avoid the policy would be plain; but since, under our statute, they are not to be so treated and misstatements do not void the policy unless made with actual intent to deceive, or unless the matter represented increased the risk of loss, the real question is whether the matter represented increases the risk of loss, it being conceded that there was no actual intent to deceive.

It is contended that the evidence does not show nor can it be inferred from the finding of fact by the chancellor that the deceased had formed a habit of drinking intoxicating liquor to such an extent as to affect his health or

physical condition and thereby render him an unsatisfactory subject for life insurance.  We are not prepared to say that the evidence preponderates in favor of the conclusion that the deceased had formed a habit of drinking liquor to such an extent as to seriously affect his health. It might well be inferred from the testimony which shows the extent to which he did drink that naturally his health would or might be impaired, but we have the positive testimony of his physician, who was familiar with his habits and his health, to the effect that his condition of health which finally resulted in his death was in no way brought about by the fact that he had used intoxicating liquors. Whether his health was affected by his habit of drinking was not, as we understand the chancellor's findings, determined as a fact; but, having found that the answers were untrue, he determined as a matter of law they were material and increased the risk of loss within the meaning of our statute.  Evidence tending to show that the appellant's health was actually impaired by his use of intoxicants reflects, not so much upon the legal conclusion as to whether his statements increased the risk of loss, as it does upon the quesiton of whether or not the deceased gave true answers to the questions asked in the application.  The extent to which the applicant used intoxicating liquors, whether his answers with respect thereto were representations of the fact or mere opinions on his part, are matters properly to be looked to in determining whether or not the answers given are true; but it having been determined that the answers were not true, it is a question of law for the determination of the court as to whether the misrepresentations constitute matter increasing the risk of loss.

This is unquestionably the rule of law in this State with respect to representations not relating directly or indirectly to the question of the applicant's health. For example, in the case of *Mutual Life Insurance Co.* v. *Dibrell*, 137 Tenn., 528, 194 S. W., 581, L. R. A., 1917E, 554, it was distinctly held that an untrue statement by the applicant as to whether he had been examined for a policy in any company or association which was not issued as applied for was as a matter of law one which was material and increased the risk of loss. In that case it was said:

"It was not the purpose of the statute to make a further change in the common law, as set forth in such decisions, so as to require that the matter misrepresented should be one that contributed to the hazard after issuance of the policy, that is, by the death of the insured, in order to make the policy invalid. . . . The common-law rule, in this country and in England, undoubtedly was and is that, if an applicant falsely state that he had not previously made another application or been examined for any other insurance upon which a policy had not been issued, the matter was so material that the policy was avoided when the statement was not expressly made the subject of a warranty and was deemed to be a mere representation."

There were three considerations stated in that case making the matter developed by such questions and answers material. In the first place, a truthful answer would have put the company upon guard and enabled it to make inquiries and further physical examination, and might have induced an outright declination. In the second place, the company was entitled to act upon the judgment of other insurance companies. In the third place, the company could judge of the applicant's anxiety for insurance, and

thereby determine the probability of the existence of hazards not revealed by the application. With respect to whether the false statement contained in the application in that case was one which under the statute increased the risk of loss, it was said:

"It cannot be that the matter misrepresented should necessarily relate to the hazard of loss by the death of the insured. Such a construction might prevent the company's rescinding the contract because of a misrepresentation that actually induced the contract, in an action begun promptly after the making of the application and the issuance of the policy. What will not avail to 'void the policy,' under the statute, it seems equally will not 'prevent its attaching,' as a contract. We cannot adopt the harsh and radical construction that the legislature meant to deprive the insurer of the right to rescind the policy contract for inducing fraud. The phrase 'increases the risk of loss' is, in our view, the same as that appearing in numerous other statutes, 'increases the risk,' and both alike include the risk of loss involved in the issuance of the policy."

It is quite true that the court, in the Dibrell Case, was not dealing with information relative to the applicant's state of health where the answers might well be said to be but an expression of opinion rather than the statement of a fact. Nevertheless, the same principle must obtain in determining whether a misrepresentation increased the risk of loss. We approved, in the Dibrell Case, the rule of law as stated by the supreme court of North Carolina in *Schas* v. *Equitable Life Insurance Co.*, 166 N. C., 55, 81 S. W., 1014, as follows:

"Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or

ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium. . . . It is not necessary, as said in Fishblate's case, that the act or conduct of the insured, which was represented by him in the application, should have contributed in some way or degree to the loss or damage for which the indemnity is claimed. Whether it was material depends upon how, if at all, it would have influenced the company in the respect we have just stated. The determining factor, therefore, in such case is whether the answer would have influenced the company in deciding for itself, and in its own interest, the important question of accepting the risk, and what rate of premium should be charged. The questions generally are framed with a view to estimating the longevity of the applicant, and any answer calculated to mislead the company in regard thereto should be considered as material."

This statement of the rule of law was deemed to have been approved by this court in *Hunter* v. *Guaranty Co.*, 129 Tenn., 572, 167 S. W., 692, and *First National Bank* v. *Fidelity & G. Co.*, 110 Tenn., 10, 75 S. W., 1076, 100 Am. St. Rep., 765.

But it is argued that this rule of law is not applicable where the information relates to mere matters of opinion, such as it is contended the information given in this policy was, and in support of this contention the administrator relies upon the cases *Hale* v. *Sovereign Camp W. O. W.*, 143 Tenn., 555, 226 S. W., 1045, *K. of P.* v. *Cogbill*, 99 Tenn., 28, 41 S. W., 340, *Rand* v. *Life Assurance Society*, 97 Tenn., 291, 37 S. W., 7, and other similar cases. These cases are not authority for the contention made. The

court did, in the Hale Case, in support of the point being discussed, quote from the Cogbill Case the statement that —"The mere omission of an applicant to mention a disease which does not, directly or indirectly, cause his death, can but be an immaterial matter in an action for the insurance. Such an omission does not affect the risk, and cannot be properly characterized as a fraudulent concealment. It is not every slight or temporary illness, and especially when not specifically inquired about, that must be revealed. Only those attacks which have, in some degree a detrimental influence upon the general health or constitution of the applicant are material to the risk, and therefore within the rule as to warranties."

But in the Hale Case the court was dealing with the truthfulness or falsity of the answer given by the applicant for the insurance, and it was concluded from the evidence that the opinions given by the applicant were trifling things in no way contributing to his death, and hence could not be treated as false representations nor as material to the risk of loss, since they were of a character that would not reasonably and naturally influence the underwriter in passing upon the application. It was not intended by the court to overrule the recognized principle that a false representation which would naturally and reasonably influence the insurer and induce him to decline the application would be material. Trifling matters such as appeared in that case and in the Cogbill Case were deemed insufficient to justify that conclusion. In that case the insured replied in the negative to a question as to whether or not he had consulted or been attended by a physician for any disease or injury during the past five years, and it was contended that this was a false statement. The

record shows that as a matter of fact the deceased had con- tracted a bad cold at one time during the five years preced- ing, and had an attack of asthma in connection with it and summoned a doctor. The doctor testified that this at- tack amounted to nothing and the deceased promptly re- covered from it, that the attack had no connection with the death of the deceased, and he died of an entirely dif- ferent character of disease. It also appeared that the de- ceased had procured a prescription from a doctor to re- duce his flesh, and had taken a trip to Battle Creek for this purpose. He was not sick when he procured this prescription or when he went to Battle Creek. Upon this evidence the court said: "It is likely that deceased over- looked these matters in his medical examination. At any rate, they were trifling things and in no way contributed to his death. We think that his answer, ignoring these things, does not affect the liability of the assurer."

In other words, the court found from this evidence that the answers were not really false, being merely matters of opinion and the sickness being trifling in their nature. Quite a different result would have followed if the evi- dence had established the answers to be false and of a na- ture calculated naturally and reasonably to influence the insurer's action upon the application.

So in the Cogbill Case the language quoted was used to support the correctness of the instructions given by the trial court to the jury in their determination as to wheth- er the answer was true or false. The question was wheth- er the insurance was procured by false representation or fraudulent concealment, and the applicant was asked if he was in good health, whether he had consulted a phy- sician for bilious fever, and being asked whether he had

certain named diseases other than the ones he had mention-
ed as having had, replied, "No"; whereas, in fact, he had had
an attack of la grippe. The trial judge instructed the jury
that the deceased was not bound at the peril of the bene-
ficiary to know and to state in his application with ab-
solute certainty his real physical condition and predis-
position to disease. The jury were further instructed that
if they found from the evidence that the applicant had a
case of la grippe which resulted in catarrhal sore throat,
and finally in his death, his failure to disclose his physical
condition would make the contract void. This charge was
criticized upon the ground that it made the applicant's
failure to disclose the fact that he suffered from la grippe
of no consequence unless that disease finally resulted in
his death. The court held there was no error in that in-
struction, using the language which we have just previously
quoted.

In the Rand Case the question for determination was
whether the representations made to the medical examiner
were true or false, and the jury responded that they were
true. Being true, of course the insurance company could
not avoid the payment of the policy. The jury was told,
in determining the question of whether they were true,
that a mere temporary ailment of the kind named will not
constitute the diseases named, as contemplated in the ques-
tions and answers given; but before any temporary ail-
ment can be called a disease, it must be such as to in-
dicate a vice in the constitution, or be so serious as to have
some bearing at least on the general health and contin-
uance of life, or such as according to common understand-
ing would be called a disease. These questions were, there-
fore, proper matters for consideration by the jury in de-

termining the truthfulness or falsity of the answers given.

As was said by the court in *Blackman* v. *Casualty Co.,* 117 Tenn., 585, 103 S. W., 785:

"The substance of these decisions is that where the statement is one concerning the existence or nonexistence of a given fact, there can be no recovery, if the matter be not truly stated, whether such failure to state with truth and correctness be the result of fraud or of innocent mistake; but that, if the statement be as to a matter of opinion merely, a lack of accuracy will not cause a forfeiture of insurance, if such statement was made honestly and after the exercise of due diligence to learn the truth of the matter so represented; it was further held that a statement concerning one's bodily condition with respect to obscure or undeveloped disease would be a mere matter of opinion, and that the insured would not be responsible for a misrepresentation as to such a matter, unless he had reason to believe that the misrepresentation was false."

In that case the fact was that the insured had no knowledge that he was in the incipient state of nephritis; he supposed that he had merely a cold. Therefore it could not be said that the applicant had given a false answer to the question which implied that he was not suffering from this particular disease.

Thus it will be observed that in these cases the court was dealing with instructions being given the jury in determining the question of the truthfulness or falsity of the statements contained in the application, and not directly with the question of whether a false statement of the character indicated would be material, within the meaning of the statute which in effect makes the representations warranties where they increase the risk of

loss.  In other words, the mere statement of a trivial mat-
ter in no way relating to the cause of death, the answer
depending almost, if not altogether, upon the opinion of
the applicant, will not be treated as making the answer
false.

.None of our cases justify the contention that no misrep-
resentation with respect to any matter that did not di-
rectly or indirectly contribute to the death of the insured
can be considered as increasing the risk of loss.  Of course,
the matter represented in the Dibrell Case did not enter
into the death of the insured as a contributing cause,
either directly or indirectly but it was, nevertheless, ma-
terial and increased the risk of loss within the meaning of
our statute, for the reason that it was information which
would naturally and reasonably have influenced the judg-
ment of the insurer with respect to the application.  The
principle is just as applicable to the situation presented
here as in that case, and, as was said by the court in that
case:

"When the jury replied that the matter of former exam-
inations or applications had in fact been misrepresented,
the other question of whether it increased the risk of loss
was one of law."

When the court found in this case that the answers made
by the applicant with respect to the extent of his use of
intoxicating liquors were false, then they did increase the
risk of loss within the meaning of our statute, if the mat-
ter itself was reasonably and naturally calculated to effect
the insurer's judgment.  Whether the matter represented
did or did not contribute to the cause of death or impair
the health of the applicant was a material matter for the
determination of the question of the truthfulness or falsity

of the answer; it is not determinative of the question of whether or not it increased the risk of loss, for that is a question of law to be determined by the court after it is ascertained that the answer was false.

It is not to be left to the insurance company to say after a death has occurred that it would or would not have issued the policy had the answer been truly given. It is true the practice of an insurance company with respect to particular information may be looked to in determining whether it would have naturally and reasonably influenced the judgment of the insurer, but no sound principle of law would permit a determination of this question merely upon the say so of the company after the death has occurred. The matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment. No misrepresentation of a mere trifling instance in the applicant's health, or the giving of a wrong opinion about the state of his health, if he might honestly be mistaken about it and not fully appreciate the dangers incident to the affliction, will render the statement false or avoid the policy, merely because an insurance company may say that it would not have issued the policy otherwise.

In this case it is established that the applicant was an habitual user of intoxicating liquors. Certainly true answers to the questions asked would have indicated that to the insurer. It is well known that the habitual use of intoxicating liquors is calculated to impair the health; it weakens the resisting power of a man's constitution, if it does not directly cause disease. More than that, when he becomes intoxicated or uses liquor to excess he is liable to be less careful in guarding his health; he subjects himself to risks and hazards that a sober man does not incur.

That liquor affects the brain, inflames the mind, and induces incautious conduct there can be no doubt. It is therefore but a reasonable and natural inquiry of an applicant for insurance as to the extent of his use of intoxicating liquors. Information such as called for in this application with regard thereto would naturally and reasonably be expected to influence the mind of the underwriter in determining whether a policy would be issued in accordance with the application. The insurance company was entitled not only to know whether the applicant's health has been impaired by the use of intoxicants, but also whether his habits were such as might increase the hazard of loss by subsequent impairment of his health or conduct which might most likely or probably affect the question of his longevity.

We conclude, therefore, from the facts found in this case, under the rules of law stated as being applicable thereto, the insurance company was entitled to have this policy canceled. The chancellor so held, and there was no error in his action.