NATIONAL LIFE & ACCIDENT INS. CO. v. AMERICAN TRUST CO.—68 S. W. (2d) 971.

Middle Section. January 30, 1933.

On Rehearing July 8, 1933.

Petition for Certiorari denied by Supreme Court, March 10, 1934.

518

Tyne, Peebles, Henry & Tyne, of Nashville, for appellant.

Jordon Stokes, Jr., and J. C. R. McCall, Jr., both of Nashville, for appellee.

FAW, P. J. This is a suit in equity, brought by the National Life & Accident Insurance Company, a Tennessee corporation, to procure the cancellation and surrender of a policy of insurance issued by complainant on the life of Harry Sudekum.

The policy in question was issued on February 15, 1930, and provided for the payment of the sum of $25,000 to "Estate of the Insured" (Harry Sudekum), upon proof of the death of the insured during the continuance of the policy.

Harry Sudekum died on December 13, 1930, and thereafter the American Trust Company, a Tennessee corporation with its principal place of business at Nashville, Tenn., qualified as administrator of the estate of Harry Sudekum, and, as such administrator, was in possession of the aforesaid policy of insurance when the original bill in this case was filed on February 5, 1931.

Complainant filed an amended and supplemental bill on May 4, 1931, in which it alleged, among other things, that, on April 23, 1931, the defendant, American Trust Company, as administrator of the estate of Harry Sudekum, deceased, filed a suit at law against complainant insurance company in the circuit court of Davidson county, Tenn., seeking a recovery of the face of said policy, together with interest thereon and the penalty provided in cases where payment due under an insurance policy is refused in bad faith. Complainant sought and obtained, through its said amended and supplemental bill, a preliminary or temporary injunction restraining the defendant from further prosecuting said suit at law until the disposition of this cause.

The aforesaid policy of insurance was, according to its terms, issued by complainant in consideration of an application therefor (a copy of which application was attached to and made a part of the contract), and of the payment of the premium of $601.75 on delivery of the policy and of the like sum to be paid on the 15th day of February of each succeeding year during the life of the insured.

At the time complainant filed its original bill herein it paid to the clerk and master of the chancery court the sum of $601.75, with legal interest thereon from February 15, 1930, for the use and benefit of defendant administrator—same being the entire amount of premiums paid on the policy in question.

It is alleged in the bill. and appears from the record without dispute, that, on February 12, 1930. defendant's intestate, Harry Sudekum. made application in writing to complainant for a policy of life insurance, in which application said Sudekum declared that each of the statements contained therein was full, complete, true, and without exception, unless such exception was noted, and that all were made as inducements to the execution of the contract of life insurance for which said application was a proposal.

It is further alleged in the bill and in the amended and supplemental bill that said applicant made false answers to certain questions propounded in said application and thereby misrepresented material facts in the procurement of said policy; that if truthful answers had been given to the questions specified in the bill, said application would have been rejected by complainant and said policy would not have issued.

An amendment to the amended and supplemental bill, making allegations of additional false representations and fraudulent suppression of facts by Harry Sudekum in his said application, was filed on January 14, 1932.

Complainant further alleged that by reason of the clause in the policy which made it incontestable after two years from its date, it was necessary that complainant upon discovery of the aforesaid misrepresentations seek a rescission of the contract before the expiration of said period of two years, in order to avail itself of the alleged false representations, and that it was without adequate remedy except in a court of equity.

In its pleadings, complainant specifies five questions in part II of the aforesaid application, to which questions it is alleged that defendant's intestate, Harry Sudekum, made false answers. These questions, with the answers of Harry Sudekum thereto, will now be stated.

"Q. 10. To what extent do you now use or have you in the past, used intoxicants, morphine, cocaine or other habit forming drugs?" A. A social drink four or five times a year."

Complainant alleges that it was its intent by said question to elicit from said applicant a truthful answer as to what extent he used at the time of said application, or had in the past used, the various articles as there set out and inquired about, and that such question and the answer thereto was material to it in determining for itself, among other things, the risk or hazard entailed in insuring a person who used any or all of the articles inquired about, and whether or not said Sudekum was a fit subject for insurance, and, if so, the rate of premium to be charged, the probable longevity of his life, etc.; that the answer to said question was intended as a statement of fact by said applicant to the effect that he did not use any of the articles inquired about except intoxicants, and that his use of intoxicants was limited to a social drink on four or five different occasions during a period of one year, and that it was so treated and relied on as a statement of fact by complainant.

Complainant further alleges that said answer relative to the use of intoxicating liquors, as made by said Sudekum as above set out, was a deliberately false representation and suppression of facts, and was made with actual intent to deceive complainant as to the extent of intoxicants used by said applicant, which facts

were peculiarly within the applicant's own knowledge; that complainant is informed and believes, and therefore alleges as a fact, that the said Sudekum did, for some time prior to the date and about the time of making said application, habitually use intoxicants in excessive quantities to such an extent that on some occasions he required medical treatment and advice in an effort to overcome the harmful effects of such drinking.

Complainant further alleges that if a truthful answer had been given to the foregoing question, and if said Sudekum had truthfully disclosed the extent to which he did use the intoxicants, instead of making a false answer thereto which was calculated to and did deceive complainant, that said application would have been rejected by complainant and said contract or policy of insurance would not have been issued upon his life.

Question 14 in said application and the answer thereto are as follows: "Have you ever had any accident or injury, undergone a surgical operation, or been an inmate of a hospital or sanitarium? (If so, give full details). No."

Complainant alleges that the answer to said question 14 above was false, in that said Harry Sudekum was an inmate of the Battle Creek Sanitarium, Battle Creek, Mich., for a period of time, having been advised to go there by one or more physicians in the fall of 1929, where he underwent treatment for a severe nervous disease or "breakdown," and that these facts were all known to the said Sudekum and peculiarly within his knowledge at the time he made said application; that he made false answer to said question in order to fraudulently conceal these facts from complainant and to prevent it making investigation at said sanitarium and among his personal physicians, in order to determine whether or not said application for insurance would be accepted, and, if accepted, the terms thereof; and that said misrepresentation and concealment were material to the risk of insurance, and was an inducement to complainant to enter into said contract as aforesaid.

Complainant further alleges that said applicant, Harry Sudekum, willfully and falsely represented the facts in answer to question 20, subsection "A," of said application, which question and answer are as follows: "Q. Have you ever had any ailment or disease of (A) brain or nervous system? A. No."

Complainant alleges that while he was an inmate of the Battle Creek Sanitarium during the fall of 1929, as before stated, said Sudekum was treated for a nervous disease, having gone there upon advice of his local physician; that said Sudekum fraudulently concealed from complainant the fact that he had such nervous disease and had been treated therefor, knowing full well that if the true facts in regard thereto had been disclosed in said application, that it would have been a determinating factor with complainant as to

whether or not said application would have been accepted; that said concealment was made with actual intent to deceive complainant, and was a deliberate misrepresentation of a fact or facts material to the risk of insurance, and an inducement to complainant to enter into said contract as aforesaid.

Subsection F of question 20 in said application was as follows: "Have you ever consulted a physician for any ailment or disease not included above?" and the answer of the applicant to said question was "No."

And question 21 in said application was as follows: "State names and addresses of physicians you have consulted, and give the occasion by reference to question numbers and letters above?" and the applicant's answer thereto was as follows: "Dr. Mat Buckner for the headache occasionally. Drs. address, Jackson Building, Nashville, Tenn."

Complainant alleges that the questions preceding subsection F of question 20 in the application made specific inquiry, among other things, as to certain diseases, ailments, conditions, etc., as there named, and that there was not included in said preceding questions any specific question relative to said applicant having consulted a physician for alcoholism or psychoneurosis, and that it was intended by said subsection F of question 20 to elicit from said applicant truthful information as to whether or not he had ever consulted a physician for any ailment or disease not included in the specific questions set out above; that by question 21 it was intended to elicit from the applicant truthful information as to the names and addresses of physicians consulted, and the occasions of such consultations, by a reference to question numbers and letters appearing above, including subsection F of question No. 20; that said questions and answers thereto, viz., subsection F of question 20, and question 21, supra, were material to it in determining for itself, among other things, the risk or hazard entailed in issuing a policy of insurance upon the life of the said applicant, and in determining whether or not said Sudekum was a fit subject for insurance; that the answers as given to said questions were intended as statements of fact by the said applicant to the effect that he had never consulted a physician or physicians for any ailment or disease not included in the preceding questions, which (preceding questions) did not include alcoholism or psychoneurosis; and further that the only physician he had ever consulted was Dr. Mat Buckner (he being one and the same as Dr. M. G. Buckner), and the only occasions for his consultations with Dr. Buckner were those times when he consulted him because of headaches.

Complainant further alleges that said answers to question 21 and to subsection F of question 20 were deliberately false representations and a fraudulent suppression of facts, and were made with

actual intent on the part of said applicant to deceive and mislead complainant, and did so deceive and mislead complainant, as to the physicians consulted by said applicant and the reasons and occasions for such consultations; that within the year and one-half next preceding the making of said application for said policy of insurance and its issuance, the applicant, Harry Sudekum, frequently consulted with and was treated by the said Dr. M. G. Buckner for an ailment or condition brought about by the excessive use of intoxicating liquors, known and described as "alcoholism;" that during the fall of 1929, prior to the making of said application for said policy of insurance and the issuance of said policy in February, 1930, that said applicant, after a period of treatment by Dr. M. G. Buckner for alcoholism, was advised by Dr. Buckner to go to Battle Creek Sanitarium at Battle Creek, Mich., for consultation and treatment of said alcoholism and its resulting effects by a specialist; that the said Sudekum did in accordance with the advice of his said physician go to the said Battle Creek Sanitarium for consultation with and treatment by a specialist for said alcoholism and its resulting effects, and that he did consult with and was treated by Dr. Martin A. Mortenson, a specialist, for, among other things, alcoholism and the nervous or brain disease, ailment, or condition known as "psychoneurosis," all brought about by the continued and excessive use of alcohol by the said applicant, Harry Sudekum; that all the facts relative to his consultations with said physicians and the occasion therefor were well known to the applicant and were peculiarly within his own knowledge at the time he made application for said insurance, but were fraudulently concealed, with actual intent on the part of said applicant to deceive complainant, and were deliberate misrepresentations of fact or facts material to the risk of insurance and an inducement to complainant to enter into said contract; that if truthful answers had been given to said questions, and a full disclosure of the facts made instead of false answers thereto which were calculated and intended to, and did, deceive and mislead complainant, that said application would have been rejected and said contract or policy of insurance would not have been issued.

The defendant demurred to the original bill, but its demurrer was overruled "with the right in the demurrant to set up and rely on all the defenses contained in the demurrer, in its answer."

After complainant had filed its amended and supplemental bill, defendant filed an answer, and later, after complainant had filed the aforementioned amendment to its amended and supplemental bill, defendant filed an amended answer.

Defendant denied that the policy in question was issued to Harry Sudekum in consideration of misrepresentations and statements contained in the aforesaid application; denied that the answers

of Harry Sudekum to any of the questions in said application, as mentioned in complainant's bills as amended, were false or untrue; denied that Harry Sudekum received treatment at the Battle Creek Sanitarium for any serious ailment; denied that complainant would not have issued said insurance policy if it had known that Harry Sudekum had received treatment at the Battle Creek Sanitarium; denied that Harry Sudekum was an inmate of the Battle Creek Sanitarium for a nervous disease within the meaning of said question numbered 20a; denied that Harry Sudekum fraudulently concealed any facts, or made any deliberate misrepresentation of facts material to the risk of insurance which was an inducement to complainant as alleged.

In its amended answer, defendant reiterated its denials that Harry Sudekum made false answers to any of the aforesaid questions; but defendant also sought, through its amended answer, to interpose a defense in the nature of confession and avoidance, by alleging that complainant had notice and knowledge that Harry Sudekum had been to Battle Creek Sanitarium prior to the issuance of its policy; that it also had notice and knowledge of the other matters and things relied upon by it; and that, having such notice and knowledge, it is estopped to set up the same in this cause as a ground for cancellation and rescission of this contract of insurance, and defendant "especially pleads knowledge of complainant as an estoppel, and as waiving said matters and things."

By way of elaboration of the allegations upon which defendant seeks to predicate its defense of waiver and estoppel, defendant's answer contains the following allegations, viz.:

"Defendant, further answering as to the allegation that Harry Sudekum, deceased, had received treatment, and was an inmate of Battle Creek Sanitarium, would state that complainant's medical examiner was informed by Harry Sudekum, deceased, at the time he made said examination, that he, the said Harry Sudekum, deceased, had been to Battle Creek Sanitarium, and that the defendant had knowledge thereof, and that even if the same had been material, which it is not, that the knowledge of such medical examiner so employed by complainant, is imputable to complainant, and complainant is estopped to set up anything in reference to this answer. Defendant avers, however, that said Harry Sudekum correctly and truthfully answered said question.

"Defendant would further state and show to the Court that complainant's counsel notified defendant's counsel that they were not going to take the deposition of Dr. Guerin, complainant's medical examiner's deposition, in which said medical examiner of complainant admitted that Harry Sudekum, deceased, told him he had been to Battle Creek Sanitarium. The same is, likewise, true as to com-

plainant's agent, Mr. R. M. Tigert, who wrote said insurance policy involved in this cause, and said insurance agent, likewise, had knowledge of the fact that Harry Sudekum, deceased, had been to Battle Creek Sanitarium, all of which was prior to the issuance of said policy of insurance.

"Defendant would further state that while complainant insists that it would have investigated had it known of these facts, nevertheless, defendant would state to the Court that the complainant made no investigation insofar as asking Dr. Buckner, whom Harry Sudekum, deceased, stated he had consulted, any questions until after the death of the said Harry Sudekum."

The defendant demanded a jury "to try the issues of fact joined," which demand was granted by the court, and five issues tendered by the defendant were submitted to a jury upon evidence on behalf of the parties, respectively, which issues, with the findings of the jury thereon, are as follows:

"Issue No. 1: Did Harry Sudekum, deceased, make false answer to the following question asked him by complainant's medical examiner?

" 'To what extent do you now, or have you in the past, used intoxicants, morphine, cocaine or other habit forming drugs?'

"Answer: No.

"Issue No. 2: Did Harry Sudekum, deceased, make false answer to the following question asked him by complainant's medical examiner?

" 'Have you ever had any accident or injury, undergone a surgical operation or been an inmate of a hospital or sanitarium?' Answer: No.

"Issue No. 3: Did Harry Sudekum, deceased, make false answer to the following question, asked him by complainant's medical examiner?

" 'Have you ever had any ailment or disease of the brain or nervous system?' Answer: No.

"Issue No. 4: Did Harry Sudekum, deceased, make false answer to the following question asked him by complainant's medical examiner?

" 'Have you ever consulted a physician for any ailment or disease not included above?' Answer: No.

"Issue No. 5: Did Harry Sudekum, deceased, make false answer to the following question asked him by complainant's medical examiner?

" 'State names and addresses of physicians you have ever consulted and give the occasion by reference to question numbers and letters above?' Answer: No."

A motion for a new trial and a motion for judgment non obstante veredicto, on behalf of complainant, were, in the order named, suc-

cessively overruled, and thereupon the court adjudged and decreed that the temporary injunction be dissolved and complainant's bills be dismissed at complainant's cost.

The complainant reserved exceptions to the several rulings of the court adverse to it as above set forth, and prayed an appeal to this court, which appeal was granted by the chancellor and perfected by appellant, and appellant has filed thirty assignments of error in this court.

Five of the first ten assignments challenge as erroneous the action of the chancellor in failing to sustain complainant's motion for peremptory instructions in its favor as to each of the five issues, which motion was made and overruled at the close of all the evidence, and, through the remaining five of the first ten assignments, appellant asserts that there is no material evidence to support the verdict of the jury in its answers to the several issues, respectively.

The eleventh assignment is based on the action of the chancellor in overruling complainants motion for a decree sustaining the bill and granting the relief prayed for therein, notwithstanding the verdict of the jury.

Thirteen assignments, numbered 12 to 24, both inclusive, complain of the refusal of the chancellor to give in charge to the jury thirteen special instructions requested by the complainant.

Assignments numbered 25 and 26 assert affirmative error in the charge of the court to the jury.

Assignment No. 27 relates to the admission of evidence over the objection of complainant; and assignment No. 28 relates to the exclusion of evidence which complainant sought to elicit by cross-examination of certain witnesses introduced by defendant.

Assignment No. 29 is that ''The court erred in approving the verdict of the jury and in failing to sustain the motion for new trial on each and every ground thereof, and in overruling same.''

And assignment No. 30 is that ''The court erred in dissolving the injunction previously issued in this cause and failing to make same perpetual and in dismissing complainant's original and amended and supplemental bill as amended at the cost of the complainant and in failing to sustain said bills, and grant the relief as therein prayed for.''

The last two assignments, supra (Nos. 29 and 30), are too general and indefinite, when standing alone, to merit consideration as assignments of error. 2 Ency. of Pl. & Prac., p. 953; Thurman v. Bradford, 3 Tenn. Civ. App. (3 Higgins), 474; Madison Land & Loan Co. v. Hammond, 2 Tenn. App., 423; Markland v. General Hospital, 5 Tenn. App., 519; Jenkins v. Southern Lumber Co., 3 Tenn. App., 605; Grundy County v. Tenn. Coal, etc., Co., 94 Tenn., 295, 298, 303, 29 S. W., 116.

The assignments complaining of the action of the chancellor in refusing to direct the jury to find the issues in favor of the complainant call for a consideration of the evidence, with respect to each separate issue, from the same viewpoint as the assignments that there is no material evidence to support the findings of the jury; for if there was evidence to take the case to the jury upon each and all of the issues, there was evidence to support the findings of the jury. Tennessee Cent. Railway Co. v. Schutt, 2 Tenn. App., 514, 515.

It would extend this opinion beyond all reasonable limits to set forth herein a statement of all the facts disclosed by the testimony of the witnesses examined at the trial, and there is no occasion that we should do so; for the first ten assignments of error, although demanding an examination of the evidence, raise merely questions of law, not issues of fact, for our decision. Wilson v. Alexander, 115 Tenn., 125, 128, 88 S. W., 935; Norman v. Railroad, 119 Tenn., 401, 422, 104 S. W., 1088; Knoxville Traction Co. v. Brown, 115 Tenn., 323, 329, 89 S. W., 319.

It is provided by statute that the trial of issues of fact by a jury in the chancery court shall be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same power and control over the finding, as on such trials at law. Code of 1932, sec. 10579, Shannon's Code, sec. 6286.

It follows that, in a proper case, the chancellor may peremptorily direct the findings of the jury upon issues of fact, but there can be no exercise of the power to direct a verdict where there is any legal doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried. See authorities cited in Elmore v. Thompson, 14 Tenn. App., 78, 81.

And it also follows from the statute above cited that, if there is any material evidence reasonably tending to support the findings of the jury, such findings, approved by the chancellor, are conclusive on this court, and we must disregard all countervailing evidence. See cases cited in note 5 under section 6286 in Shannon's Ann. Code of 1918, and also cases cited in Power Packing Co. v. Borum, 8 Tenn. App., 162, 165.

In view of the rules just stated, it is apparent that we must decide whether there is any material evidence to support the findings of the jury.

The inquiry here with respect to the first issue is, whether there is any material evidence that Harry Sudekum's use of "intoxicants" was limited to "a social drink four or five times a year."

It will be recalled that Harry Sudekum's application to appellant insurance company for the policy in question was made on February 12, 1930, and Harry Sudekum died on December 13, 1930. The jury had before it the testimony of eighteen witnesses who frequently came into personal contact with Harry Sudekum during the years of 1929

and 1930, and a number of these witnesses were intimately associated with him in business and/or social relations, or both, during that period, and (with three exceptions to be mentioned later) these witnesses testified, in substance, that they never knew Harry Sudekum to drink intoxicating liquors; that they never saw him take a drink of intoxicating liquor; that they never smelled liquor on his breath; that they never saw anything in his appearance or conduct which suggested that he had been drinking intoxicants; and that they never at any time had any reason to suspect that he had been drinking intoxicants or that he was addicted to the use of alcoholic liquors.

It is said for appellant that the testimony of these witnesses for defendant was "negative," and, therefore, had no probative value; but we are of the opinion that this testimony was relevant to the issue and was probative of the fact which defendant was seeking to establish thereby. It produced a conflict of evidence for the jury to decide, so that the court was not at liberty to determine the first issue by directing a verdict. 1 Jones on Evidence (2 Ed.), sec. 22, pp. 36-39; Id., vol. 2, secs. 601, 602, pp. 1112-1114; Tennessee Cent. Railway Co. v. Page, 153 Tenn., 84, 89, 282 S. W., 376.

We will now briefly mention the defendant's witnesses to whom we have just referred, and their relations to and associations with Harry Sudekum, in order that their opportunities for knowing the truth of their testimony may be seen.

Mrs. Gordon Davis was secretary to Harry Sudekum and worked in his office every day. She says that he came to work every day at 8 o'clock and remained on duty until midnight; that she took his dictation and assisted him in other work in which they were thrown into contact every day when Harry was not out of town; that his trips out of town lasted only a day or two; and that he never missed a day from his office when he was in town, so far as she could recall.

Tony Sudekum was a brother of Harry Sudekum. Tony was the president and Harry was the secretary of the Crescent Amusement Company. They occupied adjoining offices. Tony testified that he saw Harry and talked to him every day and night and many times a day and night, except on the infrequent occasions when one or the other of them would be out of town, and that upon these occasions they would communicate with each other by telephone with reference to their business.

R. B. Leonard, a lieutenant in the metropolitan police force of the city of Nashville, stated that he had known Harry Sudekum about twenty years before his death; that he saw him almost every day, sometimes twice a day, and sometimes as high as three times a day; that he frequently saw him at night when Harry was "working at the theater." (Harry Sudekum was manager of the Princess Theater.)

Emmett Franklin, a traffic officer of the city of Nashville, on a "beat" on Fifth avenue and Church street near the Princess Theater and Harry Sudekum's office during the years of 1929 and 1930, stated that he saw Harry Sudekum in the daytime two or three times a week and at night twice a week; that he would go into Harry's office at the Princess Theater at night and talk to him—some nights as late as 10 or 10:30 o'clock.

C. F. Fulghum, a policeman, stated that it was a part of his duty to go each night at 10 o'clock to "the shows and bring the payrolls down to Mr. Sudekum's office, count the money and go to the Bank;" that in the performance of that duty he was accustomed to be with Harry Sudekum each night about 10 o'clock and after.

J. M. Steinhaur, a traffic officer, had known Harry Sudekum "practically ever since he was born," and during the year of 1929 and the first part of 1930 he saw Harry practically every day.

Vernon Tupper, general manager of the Nashville Roller Mills, stated that he knew Harry Sudekum well and saw him quite often; that he saw Harry at the Rotary Club and organization meetings of the Community Chest and quite frequently at his (Harry's) theater; that he saw him both in the daytime and at night.

A. F. Biles testified that he is a barber and that as a barber he had been waiting on Harry Sudekum frequently since the year of 1919 and including the year of 1929.

Frank Sharp stated that he is in the real estate business in Nashville and had known Harry Sudekum "since he was a little boy;" that he had transacted a good deal of real estate business for Harry Sudekum; that during the years of 1929 and 1930 he was working on a project for Harry and Tony Sudekum in connection with the purchase of certain tracts of land on the Franklin Pike; and that he was in Harry Sudekum's office three or four nights out of each week and would frequently remain there as late as 11 o'clock in conversation with Harry.

W. B. Haynes, a traffic officer for the city of Nashville, testified that he had known Harry Sudekum about fifteen or eighteen years; that during the years of 1929 and 1930 he saw him practically every day he was in the city.

W. C. Teague, associate editor of the Nashville Banner, stated that he had known Harry Sudekum about twelve years; that they had both been members of the Nashville Rotary Club for about six or seven years; that witness saw Harry Sudekum four or five times a week.

Frank Mocker operated a place of business for the sale of confectionery, soda water, and lunches at 210 Fifth Avenue North, Nashville, which was about three doors from the Fifth avenue offices of the Crescent Amusement Company. He said that he had known Harry Sudekum about twenty-five years; and Harry Sudekum was

"one of the best customers" that witness had and was in witness' place of business frequently for the purchase of Coca-Cola, cigars, and lunches, and witness saw Harry practically every day unless he was out of town, and would see him frequently up to 10 or 11 o'clock at night.

Webb Hayes was an auditor and worked in the offices of the Crescent Amusement Company in the months of August, September, and October, 1929, and from and after February, 1930, was employed regularly as auditor for the Crescent Amusement Company and worked in the offices of said company, and, while thus working in the offices of the Crescent Amusement Company, witness saw and was associated with Harry Sudekum practically every day.

Mrs. R. M. Marbery was secretary to Tony Sudekum and worked in Tony Sudekum's office, which was in the same suite with the office of Harry Sudekum during the years of 1929 and 1930. This witness testified that Harry Sudekum was in Tony's office "a great deal." Witness stated that "he (Harry) came through our office to see Mr. Sudekum and stopped at my desk nearly every day."

Henry C. Lassing, a lawyer by profession but who had been in the county court clerk's office for the last five or six years and who is president of the city council of Nashville, stated that he had been a resident of Davidson county for forty years and had known Harry Sudekum since he was a boy and had seen a good deal of him.

A. P. Martin, a real estate broker engaged in business in the city of Nashville for the past sixteen years, stated that he was well acquainted with Harry Sudekum and estimated that he saw Harry Sudekum three or four times a week during the years of 1929 and 1930; that witness' firm handled a great deal of real estate for the Crescent Amusement Company; and that witness had to go to Harry Sudekum's office frequently.

R. E. Balch, a son-in-law of Tony Sudekum, was connected with the Crescent Amusement Company, and during the years of 1929 and 1930 he was associated with Harry Sudekum practically all of the time.

Harryette Sudekum, fifteen years old, the daughter of Harry Sudekum, had lived continuously with her father and mother all of her life. During the years of 1929 and 1930 Harryette attended the Ward Belmont School in Nashville and it was the custom of her father to take her to school each morning about 8:15 o'clock and it was Harryette's custom to kiss her father frequently in the mornings and evenings.

John Dowd was a friend of Harry Sudekum's family and visited in Harry's home "on an average of once or twice a week."

With the exception of one occurrence about four years prior to the trial of this case below, mentioned in the testimony of Tony Sudekum, and certain exceptions in the testimony of Harryette

Sudekum and John Dowd, the witnesses we have named testified, in substance, as before stated, that they had never seen or known of any fact or circumstance which indicated or suggested to them that Harry Sudekum used intoxicating liquors to any extent whatever.

The "exceptions" to which we have just referred will now be pointed out by quotations from the testimony of Tony Sudekum, John Dowd, and Harryette Sudekum, as follows:

Tony Sudekum:

"Q. Now, Mr. Sudekum, I believe you testified, I went over this this morning, but to get the connection, on your direct examination, that you never during your whole life suspected that Harry had been drinking, but on one occasion, and then you thought you detected the odor of alcohol on his breath, and that was about four years ago during the Christmas holidays, that is correct, isn't it? A. Yes, sir.

"Q. Would it be natural that Harry would conceal his drinking from you, if he had been drinking? A. I don't think so. I think he was the most open person I ever knew in my life."

John Dowd:

"Q. Did you ever see anything about Mr. Harry Sudekum indicating that he was drinking intoxicating liquor to excess? A. No, sir.

"Q. Did you ever smell whiskey on his breath? A. Well, I don't know, I have seen him take a drink, occasional drink.

"Q. To what extent have you seen him take a drink, or have you observed anything with reference to his drinking? A. No, just occasionally around home, I would say he took an occasional drink."

Cross-examination by Mr. Peebles:

"Q. What do you mean by occasional, Mr. Dowd? A. Be out to his house and maybe he would take one or two drinks with a party, but never take anything to excess.

"Q. You mean you never saw him? A. No, sir.

"Q. What is your business? A. Paul F. Eve, investment securities.

"Q. And you say you would see Mr. Sudekum on an average of once or twice a week? A. Probably that much, yes sir, I was at that time with the Lusky Jewelry Company.

"Q. A part of those times you would see him would be at his house? A. Sometimes.

"Q. Would you be out at his house on business or socially? A. No, sir, socially.

"Q. Would you be there at night? A. Yes, sir. . . .

"Q. And you say you have seen Mr. Sudekum take as many as two drinks on those occasions? A. I couldn't say how many I have seen him take, I have seen him take a drink.

"Q. You have seen him take more than one drink in the same evening, haven't you? A. Possibly so, yes sir.

"Q. All of you would take two drinks? A. Yes, sir. . . .

"Q. Would Mr. Harry Sudekum take a drink upon every occasion he would come home? A. On any occasion?

"Q. On every occasion? A. I don't know I couldn't say whether he would or not.

"Q. Did you see him on every occasion you were there take a drink? A. No.

"Q. There would be some he would not? A. Yes, sir.

"Q. Would be occasions when he would take it and occasions when he wouldn't? A. Yes, sir."

Harryette Sudekum:

"Q. Now, Harryette, just tell the court and jury what you know about your father's drinking any alcoholic liquors or any intoxicating liquors that you know about. A. He very seldom took a drink that I knew of; I never saw him except at a few of mother's parties; that is the only time I have ever seen him take a drink; and several times I have seen him turn them down then.

"Q. Have seen him refuse them then? A. Yes, sir.

"Q. I will ask you whether or not you have seen your father when he was under the influence of intoxicating liquors? A. I have not.

"Q. Now, how many—Did you usually go to your father's room when he would be at home, in the morning or in the evening, and also see him downstairs when he would come home would you usually kiss him or not? A. Yes, sir, I would.

"Q. Now, how often have you detected the odor of alcoholic liquors on your father's breath when you would see him? A. Never, except when he was at the parties; he took drinks then.

"Q. Did you ever see him come home at night when he was drinking? A. No, sir.

"Q. Did you ever hear any noise or racket or anything of that sort that your father would be guilty of that would indicate to you that he was drinking or had been drinking? A. No, sir."

On the other hand, Dr. M. G. Buckner, a reputable graduate physician of more than thirty years' experience, practicing in the city of Nashville (who was examined as a witness for complainant), testified, in substance and effect, that on six separate occasions in the year of 1929 and three occasions in 1930 he had treated Harry Sudekum for "chronic alcoholism," which the witness described as a condition brought about by excessive drinking of whisky or alcoholic liquor of some kind; that on each of these occasions he had given Harry Sudekum a prescription (known in the record as the "alcoholic prescription") which he prescribed only in cases where the patient was suffering from an excessive use of alcohol.

In his testimony, Dr. Buckner stated that he thus treated and prescribed for Harry Sudekum on certain days in the year of 1929,

as follows: January 29, February 16th, June 28th, September 2nd, September 3rd, and November 28th, and on days in the year of 1930 as follows: January 20th, March 11th, and June 22nd. The testimony of Dr. Buckner that he gave Harry Sudekum the "alcoholic prescription" on the dates above named is corroborated by C. M. Roberts, a pharmacist, who filed said prescriptions as exhibits to his testimony.

Dr. Buckner testified that Harry Sudekum was "a habitual user of intoxicating liquor"—"a spreer with drinking in between"—"a habitual spreer, that is, get on an occasional drunk that required medical attention, or medical service, to get him back in shape."

Dr. Buckner further testified that in response to a call from Harry Sudekum's home, he went to see Harry Sudekum on September 2, 1929, and found him "very drunk;" that on that day he gave Harry a "drastic purgative," and on the next day he gave him the "alcoholic prescription," and advised him to go to the Battle Creek Sanitarium at Battle Creek, Michigan; that there were two reasons for Harry to go to Battle Creek Sanitarium, viz., (1) to get over the effects of alcoholism, that is, the intense nervousness and lack of ability to sleep, insomnia, and (2) to see if it would keep him off of whisky so that he would not have a recurrence of the sprees he had been getting on.

The testimony of Dr. Charles A. Stewart and Dr. M. A. Mortenson, physicians at the Battle Creek Sanitarium, together with records of said sanitarium exhibited with the depositions of said last-mentioned two witnesses, shows that Harry Sudekum "registered in" as a patient at the Battle Creek Sanitarium on September 5, 1929; that he was assigned to Dr. Mortenson who diagnosed his case, and whose testimony is, in part, as follows:

"Q. 12. Do you know Mr. Sudekum of Nashville, Tennessee? Did you treat him as a patient while he was here? A. Yes.

"Q. 13. That was in September, 1929? A. Yes, according to our record.

"Q. 14. Doctor, the Sudekum record, if I may call it that, at the Sanitarium, has been filed as Exhibits to Dr. Stewart's deposition in this cause. I will ask you to take that record and refer to it and to refresh your recollection, if necessary, as to the date of the examination, diagnosis, etc. When did you first examine him? A. On September 5, 1929.

"Q. 15. At the time of this examination did he give you a history of what he was being troubled with? A. Yes, he did.

"Q. 16. Will you state what that history, as given, was? A. Forty years of age. Had the usual children's diseases, measles, whooping cough, chicken pox; no diseases during adult life; no operations or accidents. Habits, used coffee as a rule once a day, alcohol considerably of late, a total of nine to twelve cigars daily. Business

was theatrical. Present complaint was tired and nervous; states that he had been twenty-two years without a vacation. Since the first of this year came he had been tired, worn out, hates to get up, no initiative to start. Nervous; has increased irritability and excitability gradually increasing. Since the first of the year has begun to drink alcohol. Wants to discontinue drinking. Since September 1, 1929, has had no alcohol and only one cigar, and has felt much better.

"Q. 17. That history was given you on the fifth day of September, 1929? A. Yes.

"Q. 18. Did you make up that record or was it made up under your supervision? A. Under my supervision.

"Q. 19. Refer to the bottom of the page and state whether the initials M. A. M. are your initials placed there by you? A. Yes. I supervised the case and looked over the records of this case. I had detailed care of Mr. Sudekum.

"Q. 20. State whether or not it means that you looked at that record after it was made up and was in the nature of an O. K.? A. Yes, it does.

"Q. 21. What diagnosis, did you make a physical and medical examination of him on that date? A. Yes, I made such an examination.

"Q. 22. What diagnosis did you make? A. Alcoholism, psychoneurosis and obesity.

"Q. 23. Will you state what you mean by alcoholism? A. It is a term used to designate a condition brought about by excessive use of alcohol,—

"Q. 24. He told you he had been using alcohol and came to get rid of this habit? A. Yes, he said he wanted to stop it.

"Q. 25. What do you mean by psychoneurosis? A. That is a term for describing people who are overworked and become troubled with insomnia and restlessness and feel that they are at a loss.

"Q. 26. In other words, it is a mental trouble rather than a physical one? A. Yes.

"Q. 27. And it does not refer to any organic disturbance? A. Yes, that's right.

"Q. 28. Would you describe it as a nerve trouble? A. Yes, a functional disturbance of the nervous system.

"Q. 29. What was the third observation that you made, that of overweight? A. Yes, overweight.

"Q. 30. What treatments did you prescribe for Mr. Sudekum? A. In the first place, hydrotherapy, massage, diet, and urged him to rest as much as possible, and not be disturbed with his business affairs, is one of the things that I insisted on in his case.

"Q. 31. Is that the treatment you usually—is that the usual treatment for this trouble? A. Yes, for this type, for instance, if

you wish me to dilate, we get people who are excessive users of alcohol to such an extent that we have to put attendants on with them to see that they don't get any, and see that they get hydrotherapy and other physical measures to eliminate as such as possible—now in this case there was no occasion for putting anyone with him; he had stopped using alcohol. It was more a case of rest and building up.

"Q. 32. His history stated that he had not had any alcohol recently? A. Yes, for five days.

"Q. 33. He was under your continual care? A. Yes, I saw him every day.

"Q. 34. When did he leave the Sanitarium Doctor? A. The nineteenth day of September, 1929.

"Q. 35. What was the cause of his leaving? With your consent? A. Yes.

"Q. 36. Why did you think it was all right? A. He had been without alcohol and was sleeping well and most of his troubles were giving him no concern.

"Q. 37. In other words, as long as he did not get any alcohol he could get the same treatment, practically, at home, to a large extent? A. Yes.

"Q. 38. Did you have any correspondence with Mr. Sudekum after he left? A. I wrote him a letter giving him advice. He did not write me.

"Q. 39. Where did you address him? A. 3408 West End Avenue.

"Q. 40. Was that letter placed in the United States mail, as far as you know? A. Yes.

"Q. 41. What is your system for mail? A. It simply goes into the box for mail.

"Q. 42. That letter went in the box? A. As far as I know.

"Q. 43. It never was returned to you? A. No.

"Mr. Peebles: Defendant is hereby notified to produce the original letter, otherwise the carbon copy will be offered in lieu thereof.

"Q. 44. I will ask you to read that letter. It has already been filed as part of the record in this case with Dr. Stewart's deposition. Read the carbon copy of the letter. A. (Reading):

" 'October 5, 1929.

" 'Mr. Harry Sudekum, 3408 West End Avenue, Nashville, Tennessee

" 'Dear Mr. Sudekum: I am sending you a resume of the different examinations made while here.

" 'I am glad to report to you that as far as laboratory investigations are concerned, nothing strikingly abnormal was noted. You still persist in having some indican in the urine. This was somewhat reduced at the second investigations. The indican is an evidence of some intestinal putrefaction and resulting absorption. I see no rea-

son why you should not enjoy the best of health, provided you will eliminate the use of alcohol entirely from your regime. I would also urge you to smoke as little as possible, in fact it would be decidedly to your advantage not to smoke at all because the use of tobacco is inclined to arouse the taste for alcohol where one has been in the habit of taking it.

" 'I would also urge you to have some recreation such as golf, horseback riding or something of this sort to give you a chance to relax and get a respite from your close attention to business. I think your wife will encourage you to follow this sort of a program.

" 'With reference to diet, I would urge you not to eat too much of rich foods, practically eliminating desserts, be moderate in the use of meat, but use an abundance of fruit and plenty of green vegetables such as lettuce, celery, spinach, string beans, cauliflower and the like. Get out of doors as much as you can and do everything you possibly can to avoid thinking of business all the time.

" 'Hoping that you are feeling fully as well as when you left, and with kindest regards to Mrs. Sudekum and yourself, I beg to remain,

" 'Yours very truly,

" 'M. A. Mortenson, M. D.'

"Q. 45. You never saw Mr. Sudekum after he left? A. I did not."

Notwithstanding the strongly persuasive character of the evidence for complainant tending to show that the applicant's answer to question 10 in his application was false and misleading, we are of the opinion that the chancellor did not err in refusing to direct the jury to find issue No. 1 in favor of complainant. In addition to the inconsistency and conflict between the testimony of complainant's witnesses and the testimony of defendant's witnesses, with respect to the extent to which Harry Sudekum used intoxicants, there was evidence of prior inconsistent statements of Dr. Buckner in making out proofs of the death of Harry Sudekum, and also in making proofs of illness and disability of Harry Sudekum for the purposes of collecting on a health and disability policy held by Harry Sudekum in the United States Fidelity & Guaranty Company of Maryland in the fall of 1929.

There was no attempt to impeach the general character of Dr. Buckner for truth and veracity. On the contrary, Dr. Buckner's general high character, personally and professionally, was amply sustained by numerous witnesses, but if the witness relied upon to establish a given fact be discredited in any of the modes recognized by law (such as evidence of prior inconsistent statements made by him or by direct contradiction through the testimony of other witnesses), that fact may not be treated as established as a matter of law or for the purposes of a motion for peremptory instructions. Welch v. Young, 11 Tenn. App., 431, 440.

538

Without further discussion, the appellant's first assignment, that there is no material evidence to support the verdict of the jury in its answer to issue No. 1, and appellant's second assignment, that the court erred in failing to sustain the motion of the complainant made at the conclusion of all the evidence to peremptorily instruct the jury to answer issue No. 1 in the affirmative, are overruled.

In its response to issue No. 2, the jury found that Harry Sudekum did not make false answer to question No. 14 in his application, when he stated that he had never been an inmate of a hospital or sanitarium.

We have heretofore referred to the testimony of Drs. Stewart and Mortenson relating to Harry Sudekum's stay at Battle Creek Sanitarium. The record shows, without contradiction, that Harry Sudekum collected $400 from the United States Fidelity & Guaranty Company of Maryland for the two weeks spent by him in the Battle Creek Sanitarium under a health or disability policy insuring him against "disability which results from sickness or disease, and for which the insured is treated by a legally qualified physician."

In his "proofs" supporting his said claim against the United States Fidelity & Guaranty Company under said insurance policy, Harry Sudekum stated, upon his oath, among other things, that on September 1, 1929, he was taken ill (describing his disease as "nervous and a general breakdown") and was wholly disabled and prevented by such disease from performing any and every kind of duty pertaining to his occupation and was regularly attended by a physician, but not confined in the house, during the period commencing the 1st day of September, 1929, and ending the 23rd day of September, 1929, and that he was confined to the Battle Creek Sanitarium Hospital for the period of two weeks.

We find from undisputed evidence in the record that Harry Sudekum was, for about two weeks in the month of September, 1929, an inmate of the Battle Creek Sanitarium within the meaning of question 14 in his said application, and that there is no material evidence in the record reasonably tending to support the finding of the jury on issue No. 2. Therefore, the third and fourth assignments of error, through which appellant asserts that there is no material evidence to support the verdict of the jury in its answer to issue No. 2, and that the court erred in failing to sustain the motion of the complainant made at the conclusion of all the proof to peremptorily instruct the jury to answer issue No. 2 in the affirmative, are sustained.

The answer of Harry Sudekum to subsection A of question 20 in his application was, in effect, that he had never had any ailment or disease of brain or nervous system, and the jury found, by its response to issue No. 3, that this answer was not false.

We are of the opinion that it appears from undisputed proof in the record that, prior to his said application to complainant insur-

ance company (particularly in the month of September, 1929), Harry Sudekum had an "ailment or disease" of the "nervous system," and that he had knowledge of that fact.

As we have held with respect to issue No. 1, the evidence affords a basis for a difference of opinion as to whether or not such ailment or disease of the nervous system was caused by the excessive use of alcoholic liquors, but the fact that he was so afflicted is proved and not disputed, and his aforementioned sworn statement to the United States Fidelity & Guaranty Company shows that he knew that fact.

It follows that appellant's fifth assignment ,that there is no material evidence to support the verdict of the jury in its answer to issue No. 3, and appellant's sixth assignment, that the court erred in failing to sustain the motion of the complainant made at the close of all the evidence to peremptorily instruct the jury to answer issue No. 3 in the affirmative, are sustained.

Question No. 20 (F) in Harry Sudekum's said application was, "Have you ever consulted a physician for any ailment or disease not included above?" His answer to this question was "No," and the jury found, by its response to issue No. 4, that the applicant did not make a false answer to this question.

Ailments or diseases of the brain, nervous system, heart, and lungs were included in preceding questions, and we do not find any material evidence that Harry Sudekum ever consulted a physician for any ailment or disease not "included above" subsection F of question No. 20 in said application. Therefore, appellant's seventh assignment, that there is no material evidence to support the verdict of the jury in its answer to issue No. 4, and appellant's eighth assignment, that the court erred in failing to sustain the motion of the complainant made at the close of all the evidence to peremptorily instruct the jury to answer issue No. 4 in the affirmative, are overruled.

Through question 21 in his said application, Harry Sudekum was asked to "state names and addresses of physicians you have consulted, and give the occasion by reference to question numbers and letters above," and his answer was as follows: "Dr. Mat Buckner for the headache occasionally. Drs. address, Jackson Building, Nashville, Tennessee." The jury found, by its response to issue No. 5, that the applicant did not make a false answer to this latter question.

The natural and reasonable meaning of the above-quoted answer to question 21 in the application is that the only physician Harry Sudekum had consulted was Dr. Mat Buckner (the same person as the witness Dr. M. G. Buckner), and that he had consulted Dr. Buckner for the headache only.

The testimony of Drs. Buckner, Mortenson, and Stewart, if true, shows that Harry Sudekum consulted Dr. Mortenson in addition to Dr. Buckner, and that he consulted each of these physicians for ail-

ments and diseases other than the headache. But if it be assumed that the credibility of the three witnesses just named was for the jury (Welch v. Young, supra), nevertheless it appears from the "proofs" furnished by Harry Sudekum to the United States Fidelity & Guaranty Company in October, 1929, that he consulted Dr. Buckner, and was treated by Dr. Buckner, in September, 1929, for "nervous breakdown due to overwork and inability to sleep."

Appellant's ninth assignment, that there is no material evidence to support the verdict of the jury in its answer to issue No. 5, and appellant's tenth assignment, that the court erred in failing to sustain the motion of complainant made at the conclusion of all the proof to peremptorily instruct the jury to answer issue No. 5 in the affirmative, are sustained.

After the motion for a new trial had been overruled by the chancellor, the complainant moved the court to enter a judgment, sustaining the bill and granting the relief prayed for therein, notwithstanding the verdict of the jury and disregarding same. The chancellor overruled said motion and his action in that respect is challenged as erroneous by appellant's eleventh assignment of error.

As we understand the brief and argument of learned counsel for appellant, it is sought to base this assignment upon the evidence in the case. In Citizens' Trust Co. v. Motor Car Co., 154 Tenn., 507, 511, 297 S. W., 735, it was held, in a case like the present one, that the office of a motion for a judgment non obstante veredicto is to test the pleadings, and is inapplicable to a question of evidence. Appellant's eleventh assignment of error is accordingly overruled.

Appellant's twelfth assignment is that the court erred in failing and refusing to charge to the jury complainant's special request No. 1, as follows:

"It is one of the insistences of the complainant that the applicant, Harry Sudekum, drank intoxicants at night after the closing of the theater of which he was in charge and further that his wife, Mrs. Lucille Sudekum, had knowledge of this fact, and that she had had various conversations with complainant's witness, Dr. M. G. Buckner, relative to her husband's excessive drinking and the effects thereof. I further charge you that as the applicant's wife was sworn as a witness in this case and that the defendant had knowledge both prior to the trial hereof and during the trial hereof, that she was in delicate health and that it had the right to and could have if it had so desired, taken her deposition at any time prior to or during the trial hereof, and further that she is an interested party in this litigation in that the policy in question was payable to assured's estate and she and her one daughter being the sole next of kin and heirs at law of the assured and applicant, Harry Sudekum, they would have under the law of the State of Tennessee shared equally in the proceeds of the policy of insurance in controversy.

"I therefore charge you that in view of the fact that she was not called as a witness either in person or by deposition by the defendant hereto, that you will consider that her testimony if it had been given in this case would have been adverse to the contentions of the defendant herein, as to all issues and matters of which she had knowledge and particularly so because of the relationship of wife and husband which existed between her and Harry Sudekum during the period of time in controversy."

The entire charge given to the jury on the subject to which said special request No. 1 is directed was as follows:

"The presumption always is that competent and pertinent evidence within the knowledge and control of a party, which he withholds, is against his interest and insistence."

The instruction on this point might well have been amplified by pointing out the interest of Mrs. Lucille Sudekum in the result of the case; but it is well settled that a trial judge will not be put in error for refusal to give the jury an instruction specially requested unless such request is accurate and sound. 14 R. C. L., p. 801, citing Tennessee cases. It does not appear from the record before us that Mrs. Sudekum was "sworn as a witness in this case" or that the defendant had knowledge prior to the trial that she was in delicate health, as recited in the request. Moreover, the last paragraph of the request was equivalent to an instruction that, in view of the facts recited in the request, the jury should presume that the testimony of Mrs. Sudekum, if it had been given, would have been adverse to the contentions of defendant as to all issues and matters (in controversy in the case) of which she had knowledge. We think the language of this request was too strong, "and would have resulted in invading the province of the jury if it had been given." Fisher v. Insurance Co., 124 Tenn., 450, 489, 490; 138 S. W., 316, 325, Ann. Cas., 1912D, 1246; 14 R. C. L., p. 758.

The thirteenth assignment is that the court erred in failing and refusing to charge to the jury complainant's special request No. 2, which is the same as request No. 1, supra, except the last paragraph thereof, which paragraph is as follows:

"I therefore charge you further that, in view of the fact that she was not called as a witness, either in person or by deposition by the defendant hereto, that you will consider that her testimony, if it had been given in this case, would have been corroborative of Dr. Buckner and favorable to the contentions of the defendant herein as to all issues of which she had or might have had knowledge because of the facts as hereinbefore stated."

We are of the opinion that the second request is subject to the same criticisms as the first request, and the appellant's twelfth and thirteenth assignments of error are overruled.

Appellant's fourteenth assignment complains of the re-

fusal of the court to charge complainant's special request No. 4, and its fifteenth assignment complains of the refusal of the court to charge complainant's special request No. 9. Said special requests, numbered 4 and 9, embody the same proposition, but it is somewhat more elaborately stated in special request No. 9, which is as follows:

"Relative to the question:

" 'To what extent do you now, or have you in the past, used intoxicants, morphine, cocaine, or other habit forming drugs?'

"To which the applicant, Harry Sudekum, replied:

" 'A social drink four or five times a year.'

"I charge you that it was the intent of the complainant Insurance Company by said question to elicit from the applicant, Harry Sudekum, among other things, the fact as to the extent he had used intoxicants in the past or was using them at or about the time of the application for insurance.

"I charge you further that the answer 'A social drink four or five times a year' by the applicant, Harry Sudekum, in reply to said question, was a representation of fact to the effect that his use of intoxicants was limited to only a social drink on four or five occasions during the course of a year. I therefore charge you that if you find from a preponderance of the evidence that the said Sudekum drank materially more whiskey and/or other intoxicants prior to and/or about the time of the making of said application for insurance than a social drink on four or five occasions during a year, that then his answer to said question was false and it will be your duty to answer 'Yes' to Issue No. 1."

The instruction thus requested was not, either in words or in substance, given to the jury.

"The general rule is that statements made by an applicant for insurance, in answer to questions as to his use of intoxicating liquors, are material to the risk." 4 Couch on Insurance, sec. 884c, page 2911; Acc. Provident Savings Life Assurance Co. of N. Y. v. Dees, 120 Ky., 285, 86 S. W., 522, 524.

Under our Act of 1895, chapter 160, section 22 (Shannon's Code, sec. 3306 [Code 1932, sec. 6126]), misrepresentations in the application will avoid the policy if they are (1) "made with actual intent to deceive," or (2) "the matter represented increase the risk of loss."

Speaking with reference to the cases of Mutual Life Insurance Co. v. Dibrell, 137 Tenn., 529, 194 S. W., 581, L. R. A., 1917E, 554, and Volunteer State Life Insurance Co. v. Richardson, 146 Tenn., 589, 244 S. W., 44, 26 A. L. R., 1270, our Supreme Court said, in the case of Hughes Bros. v. Aetna Insurance Co., 148 Tenn., 293, 301, 255 S. W., 363, 366, that: "The substance of these cases is that a misrepresentation about any matter of sufficient importance, in the opinion of the court, to naturally and reasonably influence the judgment

of the insurer in making the contract, is a misrepresentation that 'increases the risk of loss' within the sense of our statute.''

''In Tennessee, false statements as to consumption of intoxicating liquor increase the risk of loss, so as to avoid the policy, if they are reasonably and naturally calculated to affect the insurer's judgment, regardless of whether or not the use of liquor contributed to the death of insured.'' 4 Couch on Insurance, sec. 884c, page 2931, citing Volunteer State Life Insurance Co. v. Richardson, supra.

If Harry Sudekum used intoxicants to the extent stated by complainant's witnesses, his answer to question No. 10 in his said application was false, and such false answer was naturally calculated to affect the insurer's judgment (and Dr. Fort, complainant's chief medical examiner, testified that it did affect his judgment) in deciding whether or not to issue the policy. Complainant was entitled to have the instruction embodied in its special request No. 9 given to the jury (Volunteer State Life Insurance Co. v. Richardson, supra, 146 Tenn., 606, 244 S. W., 44, 26 A. L. R., 1270), and the fifteenth assignment of error is sustained.

Appellant's sixteenth and seventeenth assignments of error complain of the refusal of the court to charge two special requests for instructions relating to issue No. 2; the eighteenth and nineteenth assignments complain of the refusal of the court to charge complainant's special requests for instructions relating to issue No. 3; the twentieth, twenty-first, and twenty-second assignments complain of the refusal of the court to charge complainant's special requests for instructions relating to issue No. 4, and the twenty-third and twenty-fourth assignments complain of the refusal of the court to charge complainant's special requests for instructions relating to issue No. 5.

We think the jury should have had more specific instructions with respect to each of the issues submitted to them than that received, but, in view of our holding that the trial court should have peremptorily directed the jury to find the issues numbered 2, 3, and 5 in the affirmative, and our further holding that the undisputed evidence supports the jury's finding on issue No. 4, the complainant's special requests numbered 5, 6, 7, 8, 10, 11, 12, 13, and 14 are immaterial to the result, and the appellant's assignments of error numbered 16 to 24, both inclusive, need not be further considered.

Through its twenty-fifth and twenty-sixth assignments, appellant asserts that the trial court committed affirmative error in two consecutive paragraphs of his principal charge to the jury, which two paragraphs are as follows:

''In determining whether or not the answers to the questions in the issues submitted to you were true or false, I charge you that the failure of Harry Sudekum to set forth or call attention in his answers to a slight injury or an accident of no consequence, or a mere temporary ailment, or a trifling instance, in his health which would not

indicate a vice in his constitution, or be so serious as to have some bearing at least on his general health, or the continuance of his life, would not necessarily mean that the answer was false to such of the questions as refer to accidents, injuries or diseases.

"If Harry Sudekum, when he made this application knew, or had reasons or grounds to believe, that he had any disease, even though it be latent and undeveloped, he was in duty bound to make it known, whether especially called for by any question or not; and a failure to do so, will amount to a misstatement or concealment. If, however, there was in him some hidden disease of which he knew and suspected nothing, and had no means of ascertaining, he cannot be said to have either concealed or misrepresented the fact. There can be no concealment of a fact which is not known and cannot be known by proper inquiry."

It is conceded on the brief for appellant that the above-quoted portion of the charge was "a correct statement of abstract law," but it is insisted that there was no material evidence upon which such charge could be predicated, and that, therefore, it was error to so instruct the jury.

We are not prepared to hold that the instructions challenged by the twenty-fifth and twenty-sixth assignments of error affected the result of the trial, and therefore they do not constitute reversible error. (Pub. Acts 1911, chap. 32.)

"Whether an abstract instruction will call for a reversal of a case depends on the determination of the question whether as a result of the instruction prejudice resulted to the complaining party. It is generally agreed that legal abstractions in a charge are not always hurtful and, unless it appears that they may have been so, the giving of them, while never to be approved, is not reversible error." 14 R. C. L., p. 783. The twenty-fifth and twenty-sixth assignments of error are overruled.

Appellant's twenty-seventh assignment is that the court erred in admitting as evidence, over complainant's exception, testimony of Dr. M. G. Buckner, adduced on cross-examination by defendant's counsel, relative to the details immediately succeeding the death of the insured, Harry Sudekum.

And the twenty-eighth assignment is that the court erred in refusing to permit the complainant, by cross-examination of defense witnesses, V. I. Witherspoon, Currell Vance, and/or others, to show the amount of insurance carried upon the life of Harry Sudekum, upon which payment had been refused on the ground of suicide, and for the recovery of which suits had been filed.

The twenty-seventh and twenty-eighth assignments, supra, are overruled, for the reason that they do not conform to the published rules of this court and of the Supreme Court governing assignments of error, which rules require that "when the error alleged is to the

admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, with citation of record where the evidence and ruling may be found." (See Appendix to 155 Tenn., pages V and XII.)

This disposes of all the assignments of error.

In so far as it has been determined that the answers of the applicant were untrue, it becomes a question of law for the court as to whether such misrepresentations constitute matter increasing the risk of loss. Volunteer State Life Insurance Co. v. Richardson, supra, 146 Tenn., 597, 244 S. W., 44, 26 A. L. R., 1270; Mutual Life Insurance Co. v. Dibrell, supra, 137 Tenn., 539, 540, 194 S. W., 581, L. R. A., 1917E, 554.

The decree of the learned chancellor indicates that it was predicated upon the findings of the jury. It does not appear affirmatively that the chancellor made any ruling with respect to the defense of waiver and estoppel upon which the defendant sought to rely in its amended answer. No issue with respect to this defense was submitted to the jury, and there was no occasion to do so, for the facts upon which it was sought to base defendant's claim of waiver and estoppel are substantially undisputed. These facts appear from the testimony of Dr. H. C. Guerin, the physician who conducted the medical examination of Harry Sudekum at the time the application in question was prepared, and Dr. Rufus E. Fort, complainant's chief medical examiner.

Dr. Guerin testified that Harry Sudekum answered "No" to the question as to whether he had ever been an inmate of a hospital or sanitarium, and later (before witness left the office) stated that he went up to Battle Creek to spend his vacation and relax and rest, and that he (Harry Sudekum) added, "I want you to understand I didn't go there as a patient to be treated, I just went there to relax and rest from my work," and emphasized the latter statement by "slapping the table."

Dr. Fort had known Harry Sudekum intimately and favorably for a number of years and had entire confidence in his statement (which Dr. Guerin communicated to Dr. Fort) that he had not gone to Battle Creek "as a patient to be treated," etc.

It appears from the testimony of Dr. Fort that, at the time he approved said application of Harry Sudekum, complainant had in its possession, to the knowledge of Dr. Fort, a "confidential report" concerning Harry Sudekum, which appears in the testimony of Dr. Fort as follows:

"Q. Doctor, Mr. Stokes has requested and he has been furnished with a copy of certain confidential reports, he requested this several days ago, and it has been furnished at his request. I am handing you herewith the original of this report, I don't want the name of the informant disclosed, it is turned down there, but I am going to ask you to commence. A. With the body of the report?

"The body of the report just under the word, 'confidential' and read it in full? A. About how long have you personally known the applicant? Casually. (This is the confidential reporter reporting.) About how long has the informant known him? Ten years, ten years, six years, three years.

"How long since you or your informants have seen him or heard directly of him, if not within two weeks explain fully. Yesterday (is the answer). Is the above age about correct, if not try to learn correct age? Answer, Yes. What are his exact daily duties? Answer, executive. Has he any occupation other than given above? If so, what, and how much of his time does he devote to it? Answer, No.

"Does he fly, or contemplate flying, or engage in any hazardous sport? No.

"About what would you estimate his net worth? $250,000. About what is his annual earned income from his work or business? $25,000. About what income, if any, has he from other sources, investments, etc.? And that is not answered.

"Is his general appearance healthy? If not tell why. Yes. Has he any deformity, excess weight, impairment of sight or hearing, or other defects? If so, what. No.

"Do you learn of any illness or injury past or present that might affect the risk? If so, what? When did it occur? Doctor's name? Yes.

"Do you hear of applicant or any of his family having any consumption or insanity? If so, who was it and which disease. No (is the answer.)

"Do you learn that he has occupied the same home with a person who had consumption or any contagious disease? If so, how long since? No.

"Does he use intoxicants daily or almost daily? No. If so, about how many drinks, one, two, three, etc., does he take daily? (That is checked.)

"What does he usually drink—whisky, wine or beer? (That is also checked.) Do you learn that he drinks to the extent of becoming intoxicated or drunk.

"The Court: You say that is checked. A. I mean it is not answered.

"Mr. McCall: I believe there is a dash there. A. There is a dash, you wouldn't regard that as an answer, would you?

"The Court: No. A. Do you learn that he drinks to the extent of becoming intoxicated or drunk? No.

"How many times a year does he drink to such an extent? (That also has a dash.) Does this last for a few hours only or for a day or longer? (That is also dashed.) When was the last occasion of this sort? (That is also dashed.)

"Did he in the past drink more as a habit than at present? An-

swer, Yes. If he drank to intoxication, how many times a year did this occur? See remarks.

"Did these excesses last for only a few hours, or for a day or longer? (That is answered a dash.) For how many years did he drink to such an extent. (That is answered by a dash.)

"How long since improvement or reform. (That is also answered by a dash.)

"Has he ever used cocaine, opium or other drugs? Or has he ever taken Keeley or similar cures for the liquor or drug habit? No. See remarks. Is his general reputation as to character and morals good? If not good, give details under No. 15. Answer, Yes.

"Has he any liquor connections, debts, domestic troubles, personal difficulties, feuds, or anything else not previously mentioned, that might impair the desirability of the risk. Yes.

"As a life insurance risk, do you regard him as desirable? Yes. (Now the remarks.)

" 'Your applicant is a large stockholder in the Crescent Amusement Company, is Secretary of the corporation and for about ten years prior to three months ago was the active manager of the Princess, a large vaudeville house here of that Company. Since then he has been in general charge of the management of the different theaters scattered all over the south. This business is controlled by his brother. Applicant is a capable, hard working, conscientious man and stands well in a business way. Prior to about ten years ago the applicant took an occasional social drink, was temperate, played golf regularly and enjoyed excellent health. He became Manager of the Princess Theater about ten years ago and from then till three months ago was in the habit of working ten to fifteen hours a day. He never took a vacation, was in the theater from early in the morning till eleven every night and took no exercise or recreation.'

"You want me to read all this?

"Mr. Peebles: Yes sir, read it all. It is called for. 'His wife is socially inclined, fumed and fretted because he never took her anywhere and their home life was not very pleasant tho they had no actual quarrels.

" 'About two years ago the applicant began to drink again in a social way and was soon in the habit of taking twelve to fifteen drinks a week generally two or three at a time, at his home, the home of a friend, at an office or when visiting a picture show manager in one of the nearby towns. He did not indulge to excess on any occasion and informants state that he was never intoxicated. On two or three occasions he took four or five drinks and it was apparent that he had some liquor but he was not intoxicated.

" 'This drinking, his working long hours and his nagging with his wife began to tell on his nerves and the middle of the Summer he went to the Battle Creek Sanitarium and took a rest cure. He, did

not take a liquor cure and went to the hospital more because he was run down than any other reason.

" 'Since his return from the hospital he has been doing a lot of traveling in visiting the different theaters of the Company. His work is nowhere near as confining as when with the Princess and seems to be agreeing with him. He has moderated a great deal in his drinking, taking just an infrequent social drink, looks better and seems to be in much better condition than at any time in the past.

" 'His present work allows him time to be with his family, he has just moved into a new home in Belle Meade and his home life is very pleasant.' "

■ We are of the opinion that the information received by Dr. Guerin and Dr. Fort, as above stated, was not sufficiently definite, full, and particular to afford a basis for the estoppel pleaded by defendant, particularly with respect to the answer of the applicant to question 10 in the application relating to the extent of the applicant's use of intoxicants. 14 R. C. L., p. 1167; Life & Casualty Insurance Co. v. King, 137 Tenn., 685, 703, 195 S. W., 585.

■■ We are not satisfied that the applicant's answers to questions 14, 20A, and 21 in the application, although false, would, in view of the facts known to Dr. Fort and Dr. Guerin, have influenced complainant's action in determining whether to issue the policy in question, if the answer to question 10 (relating to the extent of the applicant's use of intoxicants) was true.

"Where the issues are material, on the verdict being set aside, whether by the chancery or the Supreme Court, neither court can determine the facts and decide the cause thereon, but the cause must be retried by a jury," and "where a new trial is granted as to some issues, it must be granted as to all." Gibson's Suits in Chy. (3 Ed.), sec. 549.

The decree of the chancery court is reversed and the findings of the jury are set aside, and the cause will be remanded to the chancery court of Davidson county, part 1, for a new trial.

The costs of the appeal will be adjudged against the appellee, American Trust Company, administrator, etc. The costs accrued in the chancery court will await the future judgment of that court.

Crownover and DeWitt, JJ., concur.

## ON PETITION FOR A REHEARING.

FAW, P. J. In this case—a suit in equity involving the validity of a life insurance policy—five issues of fact were submitted to a jury demanded by the defendant, and the findings of the jury upon each and all of the issues were favorable to the defendant, whereupon the chancellor dissolved a temporary injunction theretofore granted to the complainant, the National Life & Accident Insurance Company, and dismissed the complainant's bill at its cost.

The complainant appealed to this court, and on a former day of the present term an opinion was handed down and a decree entered in and by which it was held and adjudged that there was material evidence to support the jury's findings on the issues numbered 1 and 4, but that there was no material evidence to support the jury's findings on the issues numbered 2, 3, and 5. Thereupon the decree of the chancery court was reversed, the findings of the jury were set aside, and the cause was remanded to the chancery court for a new trial upon all of the issues, on the theory that "where a new trial is granted as to some issues, it must be granted as to all," if the issues are all material. Gibson's Suits in Chancery (3 Ed.), sec. 549.

Each of the parties has filed a petition for a rehearing.

The relief sought by the bill and amended bill of the complainant insurance company was the cancellation and surrender of a policy of insurance issued by complainant on the life of Harry Sudekum, the intestate of the defendant administrator, because of alleged false statements and misrepresentations of material facts, in the insured's written application for said policy, and an injunction restraining and inhibiting the further prosecution of a suit at law brought by defendant administrator to recover the face amount of said policy, with interest and penalty. A statement of the contents of the pleadings is made in our former opinion, to which we refer without repetition of such statement.

Through its petition for a rehearing, the insurance company insists that each of the issues submitted to the jury was determinative of the whole case, in that a finding in its favor on any one of the issues would entitle it to the relief sought by its bill, and that, inasmuch as this court held that there was no material evidence to support the jury's finding in favor of defendant on three of the issues, the cause should not have been remanded for a new trial, but the relief prayed for in complainant's bill should have been granted and the policy in question canceled and surrendered.

In order that the precise question presented by the petition of the insurance company may be better understood, it will be well to state briefly the rulings of this court in our former opinion with respect to the complainant's motion for peremptory instructions below and the findings of the jury on the issues.

We held that, upon the evidence, it was proper to submit issue No. 1 to the jury, and that there was material evidence tending to support the jury's finding that the applicant did not make false answer to question No. 10 in his application, which answer was, in effect, that his use of intoxicants was limited to a "social drink four or five times a year."

With respect to issue No. 2, we held that there was no material evidence to support a finding that the applicant did not make false

answer to question No. 14 in his application, which answer was, in effect, that he had never been an inmate of a hospital or sanitarium.

On issue No. 3, we held that there was no material evidence to support a finding that the applicant did not make false answer to subsection A of question 20 in his application, which answer was, in effect, that he had never had any ailment of the brain or nervous system.

We held that, upon the evidence, it was proper to submit issue No. 4 to the jury and that there was material evidence to support a finding that the applicant did not make false answer to question No. 20(F) in his application, which answer was, in effect, that he had never consulted a physician for any ailment or disease "not included above" (referring to the preceding portion of the application).

On issue No. 5, we held that there was no material evidence to support a finding that the applicant did not make false answer to question No. 21 in his application, which answer was, in effect, that the only physician he had consulted was Dr. M. G. Buckner, and that he had consulted Dr. Buckner occasionally for the headache only.

We held that, upon the undisputed evidence, the complainant's motion for peremptory instructions in its favor on the issues numbered 2, 3, and 5 should have been sustained by the chancellor.

It is insisted for the insurance company that, inasmuch as this court has held that the jury should have been directed to find (1) that the applicant made false answer to question No. 14 in his application, when he stated that he had never been an inmate of a hospital or sanitarium; (2) that the applicant made false answer to question 20(A), when he stated that he had never had any ailment or disease of the brain or nervous system; and (3) that the applicant made false answer to question 21 in his application, when he stated, in effect, that he had never consulted any physician except Dr. M. G. Buckner and him only for headaches, the complainant is entitled to the relief prayed for in its bill, irrespective of the finding of the jury on the other two issues.

It is conceded, however, that the materiality of these misrepresentations, that is, whether they increased the risk involved in the issuance of the policy, is a question of law for the court to decide; and this concession is amply justified by the authorities. Mutual Life Insurance Co. v. Dibrell, 137 Tenn., 528, 539, 194 S. W., 581, L. R. A., 1917E, 554; Volunteer State Life Insurance Co. v. Richardson, 146 Tenn., 589, 605, 244 S. W., 44, 26 A. L. R., 1270; Hughes Bros. v. Aetna Insurance Co., 148 Tenn., 293, 301, 255 S. W., 363.

Near the close of our former opinion, we said: "We are not satisfied that the applicant's answers to questions 14, 20(A), and 21 in the application, although false, would, in view of the facts known to Dr. Fort and Dr. Guerin, have influenced complainant's action in determining whether to issue the policy in question, if the answer to question 10 (relating to the extent of the applicant's use of intoxicants) was true."

This was equivalent to a statement that this court was not satisfied that the false answers of the applicant to questions 14, 20(A), and 21 in his application, standing alone, increased the risk involved in the issuance of the policy.

In its petition to rehear, the insurance company insists, in respectful terms, that the view thus stated is erroneous, and asks that, upon this point, the cause be reheard, and that it be held and adjudged that the applicant's answers to questions 14, 20(A), and 21 in the application (which, as heretofore held, are shown by undisputed evidence to have been untrue) increased the risk of loss within the meaning of our statute (Acts of 1895, chap. 160, sec. 22; Shannon's Code, sec. 3306 [Code 1932, sec. 6126]). After a re-examination of relevant parts of the record (particularly the depositions of Drs. Fort, Guerin, Stewart, and Mortenson) and pertinent authorities, we have reached the conclusion that the petition of the insurance company should, to the extent above indicated, be granted, and it is so ordered.

Dr. Fort, as chief medical director of complainant insurance company and chairman of its "Risk Committee," had the final "say-so" as to whether the policy in question should be issued by the company. He had been well acquainted with the applicant, both in a personal and a business way, for a number of years, and had confidence in his truthfulness. He had information that Harry Sudekum had been to Battle Creek Sanitarium, but he also had before him the report of Dr. Guerin that Harry had stated, with emphasis, that he wanted it understood that he did not go to Battle Creek "as a patient to be treated," but "just went there to spend his vacation and to relax and rest."

The statement of Harry Sudekum just mentioned was quite reasonable in the light of the "character of the institution known as Battle Creek Sanitarium" as described in Dr. Fort's testimony, from which we quote as follows:

"Q. Doctor, do you know the character of the institution known as Battle Creek Sanitarium, at Battle Creek, Michigan? A. I do.

"Q. Will you describe what that is, go into detail relative to it? A. Well, it is a large institution started by the Seventh Day Adventists. They are vegetarians, and it was started as a small institution, but grew and is now a very large institution that does all kind of medicine and surgery, have a surgical department. They take medical cases of different kinds. But it is especially known as an institution where people go for a rest, have a restriction of diet. Most people eat too much anyway, and that is one of their specialties, that they restrict the diet, giving no meat, and they go there for rest, and many different diseases, but it is especially known as an institution for rest and diet, and a great many people who have some form of neurosis, or psychoneurosis, and particularly indigestion, and forms

of digestive troubles, go there for treatment. That is about the best I can describe it.

"Q. Doctor, if you were to hear that or had known that a person had been to Battle Creek Sanitarium, would that necessarily impress on your mind that he had been there for something serious, or for a rest? A. It would not necessarily carry with it the inference that he had gone there for anything serious, that he or she might have had, any particular thing, there are so many people go there for rest and to have a restriction of diet, and to be built up from being run down from one cause and another, and there are so many other institutions where they do major stuff and do not do that, I might be inclined to believe they had gone there to rest, but I don't know whether they would go there for any other purpose.

"Q. I will ask you this, Doctor; if, in this section of the country particularly, it is not known that it is a place that people go to rest, recuperate, and so on? A. Yes, I think that is true."

If Dr. Fort and other members of complainant's "Risk Committee" had known that Harry Sudekum had consulted Dr. Mortenson at the Battle Creek Sanitarium at the time and under the circumstances shown in the record, and had at that time stated to Dr. Mortenson, as a part of the "history" of his case, that one of his "habits" was the use of "alcohol considerably of late" and that "since the first of the year" he had "begun to drink alcohol" and wanted to "discontinue drinking," and that Dr. Mortenson diagnosed his trouble as alcoholism—"a condition brought about by excessive use of alcohol"—and "psychoneurosis"—"a functional disturbance of the nervous system"—such information would, naturally and reasonably, have influenced them in determining whether a policy should be issued in accordance with the application.

Accepting as true the statement of the applicant that he did not go to Battle Creek for treatment as a patient, but to spend his vacation and to relax and rest, and that he had never had any ailment of the brain or nervous system, and likewise, accepting as true his statement (in substance and effect) that the only physician he had consulted was Dr. Mat Buckner and that he had consulted him only for headache occasionally, the complainant insurance company was thereby misled and deprived of information which it would doubtless have acquired if questions 14, 20(A), and 21 had been answered truthfully and frankly, and "as sources of information are revealed, and investigation is pursued, the degree of risk of loss decreases." Mutual Life Insurance Co. v. Dibrell, supra, 137 Tenn., 536, 194 S. W., 581, 583, L. R. A., 1917E, 554.

The defendant below and appellee here, American Trust Company, administrator of the estate of Harry Sudekum, deceased, has also filed a petition for a rehearing, and has included therein a request for an additional finding of facts.

In so far as the petitioner is seeking an additional finding of facts, we think the petition is based upon a misconception of the functions of this court in jury cases. Alice L. Anderson et al. v. Susie M. Stribling et al., 15 Tenn. App., 267.

 Section 12 of chapter 100, Public Acts of 1925, requiring the chancellor and the Court of Appeals to file written findings of fact, has no application to a case tried by a jury demanded by the parties or one of them. The trial of issues of fact by a jury in the chancery court should be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same power and control over the finding, as on such trials at law. Code of 1932, sec. 10579, Shannon's Code, sec. 6286.

 In such case an assignment of error in this court that the chancellor erred in overruling a motion for a directed verdict presents a question of law and not a question of fact, and it is not the function of this court to "find the facts," but it is our duty to ascertain whether there was any material evidence reasonably tending to establish facts determinative of the issue.

"By material evidence is meant evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case. But a conflict of evidence upon a detached or separate feature or fact, even though it is material, should not of itself prevent the giving of peremptory instructions. Facts are frequently material which are by no means determinative; and facts are frequently material in themselves, but become immaterial when taken in connection with other facts. . . . So that the disputed fact must not only be material, but in itself or in connection with other facts it must be determinative of the real issues and the merits of the case." Knoxville Traction Co. v. Brown, 115 Tenn., 323, 331, 332, 89 S. W., 319, 321.

The rule that assignments of error challenging the action of the chancellor on motions for a directed verdict raise questions of law, not issues of fact, and that there was no occasion for us to extend our written opinion by setting forth all the facts disclosed by the witnesses, without regard to their determinative character, was pointed out in our former opinion. Citing Wilson v. Alexander, 115 Tenn., 125, 128, 88 S. W., 935; Norman v. Railroad, 119 Tenn., 401, 422, 104 S. W., 1088; Knoxville Traction Co. v. Brown, supra.

We have heretofore, in that part of this opinion disposing of the petition of the insurance company and in our former opinion, stated, in substance, the undisputed record facts which, we think, support the appellant's assignments that the learned chancellor erred in overruling appellant's motion for peremptory instructions to the jury to find the second, third, and fifth issues in favor of the complainant below. Our rulings on these assignments are subject to review on

the whole record by the Supreme Court on petition for certiorari, as are all matters of law; so that, on a review by the Supreme Court a petitioner will not be prejudiced or limited by the omission from our written opinion of any evidence which the Supreme Court may deem material to the issues, although we did not so regard it.

We may add, in disposing of the administrator's petition for an additional finding of facts, that it is not material that the misrepresentations were with respect to matters which did not contribute to the cause of the death of the applicant. In Mutual Life Insurance Co. v. Dibrell, supra, it is said:

"It cannot be that the matter misrepresented should necessarily relate to the hazard of loss by the death of the insured. Such a construction might prevent the company's rescinding the contract because of a misrepresentation that actually induced the contract, in an action begun promptly after the making of the application and the issuance of the policy. What will not avail to 'void the policy,' under the statute, it seems equally will not 'prevent its attaching,' as a contract. We cannot adopt the harsh and radical construction that the Legislature meant to deprive the insurer of the right to rescind the policy contract for inducing fraud." Pages 536, 537 of 137 Tenn., 194 S. W., 581, 583.

The administrator asks us to reconsider our action in sustaining appellant's assignment of error No. 15 relating to the chancellor's refusal to charge the jury in conformity with special request No. 9. Said request was as follows:

"Relative to the question:

"'To what extent do you now, or have you in the past, used intoxicants, morphine, cocaine, or other habit forming drugs?'

"To which the applicant, Harry Sudekum, replied:

"'A social drink four or five times a year.'

"I charge you that it was the intent of the complainant Insurance Company by said question to elicit from the applicant, Harry Sudekum, among other things, the fact as to the extent he had used intoxicants in the past or was using them at or about the time of the application for insurance.

"I charge you further that the answer 'A social drink four or five times a year' by the applicant, Harry Sudekum, in reply to said question, was a representation of fact to the effect that his use of intoxicants was limited to only a social drink on four or five occassions during the course of a year. I therefore charge you that if you find from a preponderance of the evidence that the said Sudekum drank materially more whiskey and/or other intoxicants prior to and/or about the time of the making of said application for insurance than a social drink on four or five occasions during a year, that then his answer to said question was false and it will be your duty to answer 'Yes' to Issue No. 1."

Finding that the instruction thus requested was not, either in words, or in substance, given to the jury, we held in our former opinion that the chancellor's refusal to so charge the jury was reversible error.

 The rule that the administrator seeks to invoke, viz., that a requested instruction must be strictly accurate to make its rejection reversible error, is well established, but we think the instruction here in question was "accurate," and was appropriate to evidence pertaining to issue No. 1. The fact (if it was a fact) that the applicant "drank materially more whiskey and/or other intoxicants . . . than a social drink on four or five occasions during a year" was material to the risk. 4 Joyce on Insurance (2 Ed.), page 3613; Volunteer State Life Insurance Co. v. Richardson, supra, 146 Tenn., 607, 244 S. W., 44, 26 A. L. R., 1270.

In this connection, petitioner, the administrator, relies upon a quotation from the opinion of this court in the case of Life & Casualty Insurance Co. v. Robertson, 6 Tenn. App., 43, 66, as follows:

"And, with reference to the question as to whether the insured had at any time used any alcoholic drinks to excess, it is generally held that questions as to whether an applicant for insurance has used or uses intoxicating liquor, and, if so, the extent and average quantity, do not refer to an occasional or exceptional use of such drinks, or an exceptional use to excess, but to the habitual or customary use. See Annotation in 26 A. L. R., pp. 1284-1288, where many adjudged cases supporting the proposition just stated are cited and digested. See, also, 4 Joyce on Insurance (2 Ed.), sec. 2096: 1 Bacon on Life & Accident Insurance (4 Ed.), sec. 285, pp. 542-546; Northwestern Life Insurance Co. v. Muskegon National Bank, 122 U. S., 501 [7 S. Ct., 1221], 30 L. Ed., 1100; Knickerbocker Life Insurance Co. v. Foley, 105 U. S., 350, 26 L. Ed., 1055."

The two paragraphs immediately preceding that just quoted are as follows:

"It may well be assumed that if the insured's 'daily consumption of alcoholic drink' was large, or he had at any time used alcoholic drinks to excess, such facts would influence the judgment of the insurance company because that would tend to 'increase the risk of loss;' hence the answers of the insured to the two questions directed to these matters, or either of them, if false, would avoid the reinstatement of the policy and bar a judgment for plaintiff. Act of 1895, chap. 160, sec. 22 (Shann. Code, sec. 3306); Volunteer State Life Insurance Co. v. Richardson, 146 Tenn., 589, 244 S. W., 44, 26 A. L. R., 1270; Pacific Mutual Life Insurance Co. v. Galbraith, 115 Tenn., 471, 21 S. W., 204, 112 Am. St. Rep., 862.

"But the question, 'What is your daily consumption of alcoholic drink?' seems to assume that the insured consumed alcoholic drinks, and the inquiry was directed to the extent of his daily consumption;

hence, when the question is thus understood, the answer 'none' is simply a statement by the insured that he was not addicted to the daily use of alcoholic drink. McEwen v. New York Life Insurance Co., 42 Cal. App., 133, 183 Pac., 373; Keatley v. Grand Fraternity, 2 Boyce (Del.), 267, 78 Atl., 874.''

The first of the two questions under consideration in the Robertson Case, supra, was ''What is your daily consumption of alcoholic drink?''

To which the applicant answered ''None.''

The next question was ''Have you at any time used any of them to excess?''

To which the applicant answered ''No.''

We think the difference in the questions and the resulting inapplicability to the instant case of the opinion in the Robertson Case are apparent, without comment.

The petition of the administrator for a rehearing is denied and dismissed at its cost; but the petition of the appellant insurance company is granted to the extent before indicated, and that part of the former opinion and decree of this court directing the remand of the cause for a new trial is vacated and set aside, and a decree will be entered here sustaining the complainant's bills and ordering the policy in question to be canceled and surrendered to the complainant, and that the preliminary or temporary injunction granted by the chancellor be made permanent.

The costs of the cause, including the costs of the appeal, will be adjudged against the appellee, American Trust Company, as administrator of the estate of Harry Sudekum, deceased.

Crownover and DeWitt, JJ., concur.